**LANDRETH et ux. v. UNITED STATES.**

Civil Action No. 760.

District Court, N. D. Texas,
Fort Worth Division.

Dec. 9, 1946.

Weeks, Bird & Cannon, of Fort Worth, Tex., for plaintiff.

A. W. Christian, Asst. U. S. Atty., of Fort Worth, Tex., for the Government.

JAMES C. WILSON, District Judge.

This is a very interesting tax suit, involving whether certain income received by plaintiffs was ordinary income or the proceeds of the sale of a capital asset.

In each of 1939 and 1940, plaintiffs E. A. Landreth and wife received, as community income, from Phillips Petroleum Corporation as their share of Phillips payments under an agreement of May 2, 1939, $12,780. Plaintiffs, in the returns, considered these sums as gain arising from the sale of a capital asset held for over two years; the Commissioner of Internal Revenue redetermined that these sums were ordinary income and that each plaintiff owed deficiencies in income tax of $354.45 for 1939 and $1,152.32 for 1940. After payment of these amounts, with interest in each case of $71.39 for 1939 and $163.88 for 1940, on August 7, 1943, plaintiffs subsequently filed claims for refund were disallowed and this suit followed.

I will make this memorandum as brief as possible. In the following transactions, E. A. Landreth acted (except during his illness his brother W. H. Landreth acted) as trustee for himself and the individuals mentioned in the agreement of May 2, 1939; Phillips was well acquainted with this trust relationship at all times.

Landreth and his associates were pioneers in the development of oil and gas in Ector County, Texas, and in 1936 directly controlled about 12 of the gas supply of the Goldsmith Pool in that county; Phillips owned about 17%, Gulf Production Company about 35% and other interests the remainder. The Landreth interests, who had wide experience with such matters, considered the area attractive for a natural gasoline plant and in 1936 began taking steps looking to the establishment of such a plant in that area; by February 1937 they had secured commitments from the owners of some two-thirds of the gas supply in that Pool to give them natural gasoline contracts. These NGA contracts entitled the holder to receive at the wells and process all the natural gas produced from the described acreage. While taking these steps Landreth learned that Phillips was making similar moves, with a similar objective. The two got together in March of 1937 and agreed to pool their interests. Their agreement was expressed by a written contract dated April 20, 1937. This contract was very comprehensive but did not label or describe their relationship. I will not recite the terms of the contract which is in evidence as plaintiff's Exhibit 2. Under it, Landreth was to supply NGA contracts on all production in the Goldsmith Pool; Phillips was to build at its own cost a natural gasoline plant and polymerization unit; plans and specifications were subject to inspection by Landreth's representative; Phillius "Shall have sole ownership, management and control of the operation of" the plants, the right to sell products, receive all proceeds of sale, and "When Phillips shall have been reimbursed from the proceeds of the sale of such products for the cost and expense of construction of such plants and units, the net profits derived from the operation of such plant and unit, over and above the cost of construction and operation thereof, shall be distributed between the parties

hereto, two-thirds thereof to Phillips and one-third to Landreth;" the plant and unit could be used for the processing of gas from other areas providing that Phillips would pay a reasonable and fair rental to be fixed by agreement between Landreth and Phillips; that if operations should cease to be profitable and the properties should be salvaged, then Phillips was to be reimbursed for its cost of construction, taking into account prior proceeds of plant products sold and the excess or surplus was to be divided, two-thirds to Phillips and one-third to Landreth; the contract set out the charges which Phillips was entitled to make against net profits, provided that either party could sell the natural gasoline and charge a commission of one-eighth of one cent per gallon; provided that Landreth should not be called upon for capital investments; that Landreth was to have access to the books and records of Phillips relating to the business in connection with said properties and that Landreth could have a representative at the plant who was to have full freedom of the plant and all records and information relating to the business to be conducted under the contract.

Landreth duly delivered the NGA contracts as he had contracted to do; Phillips built the plant as it had contracted. Landreth maintained a representative (Cotten) at the plant during construction and thereafter until May 2, 1939. Up to that time there had been no net profits; Phillips was not indebted to Landreth in any manner. On May 2, 1939, after negotiations, Landreth and the other beneficiaries for whom he had acted throughout, executed an agreement which stipulated that such beneficiaries, including Landreth, referred to as "Assignors" warranted that they were the owners of all rights, interests and privileges granted to or acquired by Landreth under the contract of April 20, 1937, that all such rights, etc. are free and clear of liens and encumbrances and that they "Hereby sell, assign, transfer, convey and quitclaim unto Phillips Petroleum Corporation all of such rights, interests and privileges" and that all obligations of Phillips under said contract shall be terminated. The consideration to the Landreth interests

was $300,000 payable in annual installments of $60,000 beginning in 1939. Plaintiffs, each of whom had a 10.65% interest, received $12,780 in 1939 and 1940.

Plaintiffs contend that the relationship between Landreth and Phillips was a joint venture, a species of partnership; that plaintiffs' interest in such venture, acquired on April 20, 1937, was a capital asset which was sold on May 2, 1939; and that the capital gains provisions of the Internal Revenue Code apply. Defendant contends that no joint venture existed but that the sums received by plaintiffs were the realization upon a profit sharing contract whereby Phillips obligated itself to divide future income on account of services rendered by Landreth. Defendant also contends that the contract of April 20, 1937, is plain and unambiguous and that evidence of the intent and conduct of the parties thereunder is inadmissible. A reading of the contract will show that it is not plain and unambiguous on the point here involved; I do not understand how defendant can seriously so contend, in view of the reasonable divergence of the parties as to the proper construction. The construction the parties give to a contract by their words and conduct under it is always admissible. The testimony, letters and activities which I have considered in nowise contradict the terms of the instrument but, on the contrary, show what the parties thought they were doing. I know of no reason why, in the construction of the contract, the defendant should be in any better position than Phillips, if Phillips were a party to this case and taking defendant's view.

The contract of April 20, 1937, should be considered in its proper setting. The parties thereto were of vast experience in similar undertakings. Each party carefully surveyed the undertaking and was undoubtedly fully advised of the strength and intentions of the other; the result was an agreement whereby one furnished the gas, the other the plant and profits were to be divided two to one. To say that Phillips agreed to give the Landreth interests one-third of the net profits of a million dollar project merely for services in procuring

gas contracts would indicate a lack of business experience and a refusal to take the contract at its realistic worth. While the contract does not name the relationship between the parties, it does unmistakably show the parties intended more than a mere profit-sharing agreement. It is true that it provides that Phillips was to have the sole ownership and management of the plant but it does not give Phillips the sole ownership and management of the business which the arrangement contemplated; Landreth stipulated that his representative was to have full freedom of the plant, books, the records, and other information "relating to the business to be conducted hereunder." That provision was not an empty form as we shall see. The contract provided that Phillips was to be "reimbursed" for the cost of the plant; one does not speak of being *reimbursed* for the cost of property which he is to own after reimbursement. After such reimbursement, and the payment of operating costs (Landreth's share being deductible from gross profits), the net profits were to be "distributed between the parties hereto." No provision in this contract obligates Phillips to *pay* Landreth anything. Defendant asserts that Landreth was not to bear any losses; the contract provides that Landreth cannot be required to make capital contributions; he bore his share of operating losses, but such share, by agreement, was restricted to collection from a certain fund—gross profits. Still more significant, the contract provides that if Phillips should process gas from other areas, it would pay a reasonable and fair rental or royalty to be fixed by the parties or by arbitration. Rental is pay for the use of property. Phillips was to keep the records of the venture and give Landreth a strict accounting periodically. The provision which perhaps most clearly discloses Landreth's proprietary rights and interests is found in paragraph 5. That paragraph provides, in effect, that if the operations cease to be profitable and the properties are junked or salvaged, and Phillips has not previously received its costs of construction from operating profits, *it shall be entitled to receive the proceeds of* salvage sold until reimbursed for costs of construction and the excess is to be *divided* two-thirds to Phillips and one-third to Landreth. This does not say that Landreth is to be paid one-third; the term used here, is "divided," corresponding to "distributed" in the case of net profits. If Landreth had no proprietary interest in the plant, why was he to get one-third of the sales price of salvage, after reimbursement? This provision cannot be reconciled with any contention that this was a profit sharing contract in return for services; this provision, in conjunction with the remainder of the contract, irrefutably reveals that these parties intended that Landreth was to have an interest far greater than the mere right to collect a share of the profits. Considering the contract as a whole, indications that the parties intended that relationship known to the law as a joint venture, clearly preponderate over any other possible construction.

If, in considering the joint venture issue, the contract itself might leave any doubts, which to my mind, it does not, such doubts are removed upon consideration of the conduct of the parties under the contract and the construction they expressly gave it. I will not undertake to itemize the documentary testimony introduced—which was merely a sampling of the whole correspondence—or detail the many indicative joint activities. Landreth testified that during the whole history of the enterprise, the Landreth interests participated in every phase of the construction of the plants and the operation of the venture and that Phillips frequently indicated that Landreth was a partner. That evidence is uncontradicted. In fact, the evidence shows clearly that Phillips neither had nor attempted to exercise sole management and control of the plants or the joint business but that in every phase of construction and operation, Landreth, through his representative Cotten, was taking the position of an equal and at times, a controlling part in the joint activities. During the construction of the plant, Phillips billed Landreth for one-third of the cost of construction and equipment; during construction, Cotten repeatedly called Phillips' attention to errors in bookkeeping cost, errors in construction, misuse of equipment, agreements to install or remove equipment, exorbitant purchases and

prices, etc.—which Phillips admitted, corrected or explained. On several occasions Cotten refused to permit Phillips to use certain equipment and Phillips acquiesced; on others, Landreth, at Cotten's suggestion, required Phillips to remove equipment or reinstall it. Landreth, through Cotten (an experienced plant engineer) took equally firm positions with respect to daily operations, requiring Phillips to properly restrict the use of the plant, specifying prices which Phillips was to pay for products it used where not specifically covered by the contract, approving and on occasion, disapproving submitted payrolls, requiring Phillips to revise its bookkeeping and so forth. In many instances where Phillips was purchasing for its own use, the plant products, or otherwise dealing with the venture as an outsider, Landreth assumed the position of exclusive manager of the enterprise. Landreth was credited with his share of gross income and monthly profit and loss statements were rendered to Landreth by Phillips under the name of "Phillips-Landreth-Goldsmith Plant"; status reports were forwarded dealing with "Landreth's one-third interest" and "Landreth's one-third interest as per ledger December 31, 1938" which included one-third of the gross construction costs, gross operating expenses, gasoline sales, gas sales and miscellaneous income; such reports terminated with, for example, "Goldsmith Plant—Landreth's one-third interest investment this date, $473,469.67." Various letters from Landreth and from Phillips refer to the partnership and the joint Goldsmith Plant. Exhibit 23, a letter dated May 17, 1938 from K. S. Adams, President of Phillips, asks if Landreth "would be interested in making a change in the ownership in the gasoline or poly plant." Landreth's reply mentions the "Goldsmith venture," "the acquisition of our interest in both plants," and in general reflects one partner discussing the sale of his interest to the other partner. These negotiations led to the sale of May 2, 1939. These Exhibits and activities, written and performed by the parties, furnish conclusive proof that Landreth and Phillips considered themselves as joint venturers. I hold that they were joint venturers. Whatever interest Landreth and his associates had in the natural gasoline enterprise—the share of a joint venturer or interest in the partnership—was sold pursuant to the contract of May 2, 1939; that instrument reflects a sale.

In addition to the foregoing findings and conclusions, I specifically find and conclude:

1. As evidenced by the contract of April 20, 1937, the conduct of the parties thereunder and the construction they placed upon it, the enterprise contemplated by said contract was a joint undertaking, both parties participating in the management and contributing to the assets and both parties intended to create a joint venture;

2. The legal relationship created by the aforesaid agreement was a joint venture, a species of partnership, and the proprietary interest of each of the parties therein was a capital asset as defined by the Internal Revenue Code. 26 U.S.C.A. Int.Rev.Code, § 117(a). The Landreth interest was held by W. H. Landreth and E. A. Landreth during the periods each was Trustee of the Landreth interests, for the benefit of plaintiffs and other individuals.

3. The aforesaid capital assets, after having been held for more than two years, was sold by plaintiffs (and others constituting the Landreth interests) to Phillips Petroleum Corporation on May 2, 1939, and the sales proceeds received by the plaintiff were capital gains subject to taxation in accordance with the capital gains provisions of the Internal Revenue Code. 26 U.S.C.A. Int.Rev.Code, § 117. The plaintiffs in their 1939 and 1940 income tax returns properly reported said proceeds.

4. Plaintiffs are entitled to judgment for the amounts paid to the Collector of Internal Revenue at Dallas, Texas, on August 7, 1943, together with interest from said date as allowed by law.

An order may be drawn accordingly.