William D. FRAZELL and Martha
T. Frazell

v.

The UNITED STATES of America.

Civ. A. No. 8031.

United States District Court
W. D. Louisiana,
Shreveport Division.

Jan. 31, 1963.

**458**

W. Scott Wilkinson, Wilkinson, Lewis, Madison & Woods, Shreveport, La., for plaintiffs.

Edward L. Shaheen, U. S. Atty., Shreveport, La., for the Government.

1. The action is brought pursuant to 28 U.S.C.A. § 1346(a) (1) and § 1402(a) (1).

BEN C. DAWKINS, Jr., Chief Judge.

This action is brought to recover income taxes assessed, and paid under protest, together with statutory interest, from the Government.[1]

In substance, the complaint alleges that the Internal Revenue Service erroneously assessed and collected additional federal income taxes (and interest) from plaintiffs, William D. Frazell and his wife, for the year 1955, in the amounts of $32,084.90 from each plaintiff. Plaintiffs pray for judgment in these amounts plus interest against the United States.

Although the facts are relatively undisputed, the case having been submitted on the pleadings and evidence adduced without trial on the merits, the parties disagree over the legal consequences flowing therefrom. The facts are:

Frazell is a geologist by occupation, having been graduated with a Bachelor of Science degree in Geology from Southern Methodist University in 1934, and a Master of Arts degree in Geology from the University of Texas in 1935. Following graduation, he was employed by Union Producing Company as a geologist and continued in that position until 1949, when he became associated with W. C. Woolf and N. H. Wheless in a speculative oil venture, the legal nature of which is seriously disputed by the parties. The Government maintains that plaintiff was merely "employed" by Woolf and Wheless, while Frazell contends that he was a principal to a "joint venture" among the three. Both parties point to the written agreement setting forth the relationships among Woolf, Wheless and Frazell in support of their respective positions.[2]

The essence of the agreement was that Frazell would combine his technical skill and geological information with capital supplied one half by Woolf and one half by Wheless for the purchase and develop-

2. The entire agreement is hereinafter set forth as an appendix to this opinion.

ment of oil, gas and mineral leases in Texas and any other areas designated by Woolf and Wheless during the life of the contract. Frazell, upon discovering likely mineral producing acreage, was to secure contracts for the acquisition of leases or other mineral rights, and submit them to Woolf and Wheless for their approval, whereupon the interests would be acquired by Frazell, one half in the name of Wheless and one half in the name of Woolf.

Frazell's findings and recommendations would not obligate Wheless and/or Woolf and, upon either or both of the latter declining to acquire the interests, Frazell would be allowed to make other arrangements for his own acquisition or acquisition by a third party only with the written consent of Wheless and Woolf. Any interests acquired by Wheless and Woolf in which Frazell did not desire an interest would not relate to plaintiff's participation under the agreement.

Frazell agreed to a monthly salary or drawing account of $675.00, plus expenses, in return for his full-time efforts in discovering and securing potentially profitable mineral properties or interests for future development. Presumably to give Frazell added incentive, Woolf and Wheless provided for limited participation by him in the profits resulting from development of the leases which he secured. Frazell's interest would arise according to the agreement only after Wheless and Woolf had recovered their full costs and expenses on the properties. All property and leases acquired by Frazell were to be held under record ownership of Wheless and Woolf who, together, retained at least nominal control and management over the properties.

After recovery of expenses and costs by Wheless and Woolf, Frazell, upon written request, was to be assigned his specified interest in the properties and thereafter be entitled to the portion of production allocated to his interest. His interest was subject, however, to its proportionate share of future costs for

developing, operating, producing, transporting and marketing the production from the properties, plus a "reasonable charge" for overhead costs and expenses. Any outstanding indebtedness against the properties would be charged pro rata against Frazell's share of production from the properties.

The agreement further provided that, should Wheless and Woolf dispose of the properties and, after recovering costs and expenses, realize a profit therefrom, Frazell would be entitled to his proportionate share therein. Prior to assignment of his interest in any property to him, Frazell was prohibited by the terms of the agreement from disposing of his rights arising under the agreement. After being assigned his interest, Frazell, prior to disposing of all or any part of his interest, was obligated to grant Woolf and Wheless what amounted to a "first option" on the purchase thereof.

His participation was limited to those leases and interests acquired through his efforts under the provisions of the agreement, which, upon thirty days' notice by any party, was subject to termination.

The combined efforts of Frazell, Wheless and Woolf under this agreement proved profitable. From February 9, 1951, through March 31, 1955, Wheless and Woolf advanced capital in the sum of $1,245,106.00 and recovered from oil and gas production on the properties the sum of $1,008,613.00, thus leaving an unrecovered balance in the sum of $236,493.00. In the period beginning January 1, 1955, and ending January 1, 1956, the properties produced an average net monthly income of $29,326.00. Because no further expenditures for development were required, Frazell, Wheless and Woolf expected the properties to be "paid out" by November 30, 1955.

The parties to this agreement decided, at this time, to organize a corporation for the purpose of continuing their mutually profitable association in oil and gas ventures. Accordingly, on March 21, 1955, Frazell, Wheless and Woolf organized the W. W. F. Oil Corporation un-

der the laws of Delaware. All properties acquired through the efforts of Frazell under the agreement were transferred to the corporation and each party received shares of stock in the corporation proportionate to his respective interest in the properties. Wheless (N. H. Wheless Oil Company) received 21,750 shares. Woolf received 21,750 shares, and Frazell received 6,500 shares (13% of the aggregate 50,000 shares). In addition, Frazell was elected president of the W. W. F. Oil Corporation at an annual salary of $16,000. Woolf and Wheless were elected Vice Presidents.

In filing their federal income tax returns for the year 1955, plaintiffs treated their receipt of the 6,500 shares of stock in the W. W. F. Oil Corporation as a tax-free exchange of property for stock under Section 351(a) of the Internal Revenue Code of 1954.[3]

Subsequently, the District Director made an additional assessment against each plaintiff in the amount of $26,364.54 (additional federal income taxes for the period from January 1, 1955, through December 31, 1955,) and $5,720.36 (interest), or an aggregate demand for $32,084.90 against each plaintiff.

In the Director's "Explanation of Items Changed," he reasoned that, under the original agreement among Wheless, Woolf and Frazell, the interest possessed by Frazell was only a "contingent interest," of such a nature that the taxpayer would not be considered as "owning" an interest in the properties until the "payout" was accomplished. Therefore, he reasoned, when the properties were transferred to the W. W. F. Oil Corporation prior to "payout," the taxpayers were not in a position to exchange "property" for the 6,500 shares of no par value stock they received because their "contingent interest" amounted only to " * * * a promise to receive an interest in the properties, if and when, payout was accomplished." Section 351(a) of the Code allows for a tax-free exchange of property for stock but since the taxpayers did not "own" an interest in the properties, according to the Director's position, the taxpayers had no "property" within the meaning of that Section which they could transfer in exchange for the 6,500 shares of stock in the W. W. F. Oil Corporation. Accordingly, the stock thus received by taxpayers was treated, for tax purposes, as additional compensation for services rendered by Frazell in his capacity as a geologist, and taxed accordingly under the provisions of Section 61(a) (1) of the Internal Revenue Code of 1954. The Engineer Revenue Agent set the fair market value of the stock at $14.00 per share and the resulting value of the stock received by Frazell was set at $91,000.00. This amount was returned to income under Section 61(a) (1) for the year 1955.

The parties have jointly stipulated that the ultimate issue to be resolved is whether the Commissioner correctly included the $91,000.00 in Frazell's gross income for the taxable year 1955. They further agreed that, should judgment for plaintiffs in any amount be rendered, the Internal Revenue Service shall compute the resulting tax consequences subject to review by plaintiffs.

Plaintiffs' position is that Frazell, after working for Union Producing Company for fourteen years, decided to forego his fixed salary in order to embark on a joint venture with Wheless and Woolf, thereby combining his geological information and professional training with capital supplied by Wheless and Woolf. As noted above, from February 9, 1951, through March 31, 1955, Wheless

---

3. Section 351(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 351(a), provides, in pertinent part:

"(a) *General rule.*—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c) ) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property."

and Woolf advanced capital in the sum of $1,245,106.00 but recovered from oil and gas production the sum of $1,008,613.00. During this same period, Frazell supplied to the venture a very valuable oil map which was his private property, as well as his professional information, knowledge and skill in furtherance of the joint efforts of the parties, and in addition to a growing interest in the properties, received a monthly salary or drawing account of $675.00 (later increased to $833.00 from September 1, 1953, through March 31, 1955).

Because from January 1, 1955, through January 1, 1956, the average net monthly income (less operating expenses) from the properties subject to the agreement was $29,326.00 and the parties expected the properties to be "paid out" in eight months following March 31, 1955, Frazell approached Wheless and Woolf with the suggestion that the joint venture be terminated so as to allow Frazell to partially "cash in" on the fruits of the venture.

Wheless countered Frazell with a proposal that the parties form a corporation, transfer the properties subject to the joint-venture agreement to that corporation, and issue capital stock to each party in proportion to his respective interest in the properties. Subsequently, the W. W. F. Oil Corporation was formed and Frazell was issued the 6,500 shares of stock.

Although the properties had not fully "paid out" at the time of their transfer from the joint venture to the corporation, Frazell argues that he had a so-called "carried interest" in the properties which meets the definition of "property" as set forth in Section 351(a) of the Code.

Defendant contends, however, that the agreement of February 9, 1951, is merely a contract of employment whereby Wheless and Woolf agreed to employ Frazell for a fixed salary of $675.00 per month with additional compensation for services rendered in the event Frazell's efforts proved profitable and all costs and expenses were recovered by Wheless and Woolf. It contends that the receipt of 6,500 shares of no par value stock in the subsequently formed W. W. F. Oil Corporation was merely additional compensation for geological services rendered and was thus correctly included in plaintiffs' gross income for the year 1955, the year when the additional compensation was received.

Defendant points specifically to what it contends was rigid control and management power vested in the employers, Wheless and Woolf; Frazell's fixed monthly salary of $675.00 (later changed to $833.33); the total absence of any risk assumed by Frazell; the lack of any capital investment by Frazell in the enterprise; the absence of profit-sharing between Frazell and the other principals to the agreement; the retention of title by Wheless and Woolf to all properties acquired by Frazell pursuant to the agreement; and the absence of an intent to form a joint venture or partnership as evidenced by the clear and unambiguous language of the agreement of February 9, 1951. Even if it is conceded that Frazell's interest in the properties was a "property" right, argues the defendant, under the employment agreement the receipt of 6,500 shares would still constitute additional compensation for services rendered and, accordingly, would be included in gross income for tax purposes.

We are convinced, however, that plaintiffs have proved by a preponderance of the evidence that the exchange of their interest in the oil and gas properties subject to the February 9, 1951 agreement for the 6,500 shares of stock was a tax-free exchange of property for stock as contemplated by Section 351(a). Before entering upon an analysis of the basic principles governing joint ventures it is noted that the Louisiana jurisprudence on this subject is not unlike that in a majority of other American jurisdictions.[4] See, generally O'Neal, An Ap-

4. In a suit for refund of federal income taxes allegedly wrongfully assessed and

collected, a determination of a joint venture necessitates application of State

praisal of the Louisiana Law of Partnership, 9 La.L.Rev. 307, et seq. (1949).

■■■ In Louisiana a joint venture results from an undertaking by two or more persons to combine their property, capital, labor or skill or any combination of these elements in the conduct of a particular line of trade or general business, for joint profits, thus creating the status of a partnership, although the facts may not show a formal partnership. See Ault & Wiborg Co. of Canada v. Carson Carbon Co., 181 La. 681, 160 So. 298 (La.Sup.Ct., 1935), and Daily States Pub. Co. v. Uhalt, 169 La. 893, 126 So. 228 (La.Sup.Ct., 1930). In this respect, joint ventures are likened to partnerships and are governed generally by the same rules. Ludeau v. Avoyelles Cotton Co., Inc., 164 La. 275, 113 So. 846 (La.Sup. Ct., 1927), and Fossier v. American Printing Co., Ltd., 130 So.2d 529 (La. App., 4th Cir., 1961) ; LSA–Civil Code arts. 2801–2890.

■■■ The status of a partnership is defined as a " * * * synallagmatic and commutative contract made between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill or industry, furnished in determined proportions by the parties." LSA–Civil Code art. 2801. Thus, a partnership or joint venture may be founded on contributions of capital by one party, and contributions of skill, time or labor by the other. LSA–Civil Code art. 2809 and Succession of Melancon, 167 La. 221, 119 So. 28 (La.Sup.Ct., 1928). Both the joint venture and the partnership must ultimately rest upon a contract, express or implied, between the parties who must, as between themselves, have intended to form a partnership or joint venture. LSA–Civil Code art. 2805, Glover v. Mayer, 209 La. 599, 25 So.2d 242 (La.Sup.Ct., 1946) ; Williams v. Ralph R. Miller Shows, 15 So.2d 249 (La.App., 1st Cir., 1943) ; Porter v. Cooke, 127 F.2d 853 (5th Cir., 1942) ;

and Shushan Bros. & Co. v. Drennan & Hillcoat, 158 La. 480, 104 So. 214 (La. Sup.Ct., 1925).

■■ A sharing in the profits of the enterprise is essential to the relationship of joint venture or partnership as is the sharing of control or management of the affairs of the enterprise. LSA–Civil Code, art. 2811; Yearwood v. United States, 55 F.Supp. 295 (W.D.La., 1944) ; Hawkins v. Travelers Indm. Co., 73 So.2d 348 (La.App., 2d Cir., 1954) ; and Pillsbury Mills, Inc. v. Chehardy, 90 So.2d 797 (La.Sup.Ct., 1956). A provision for recoupment by a partner or joint venturer of capital advances before a dividend of profits is declared does not affect the partnership or joint venture relationship. Fossier v. American Printing Co., Ltd., supra, and authorities cited therein.

■■ Although joint ventures are often limited to a single business transaction, they sometimes characterize a business enterprise lasting over several years. Emerson v. Shirley, 188 La. 196, 175 So. 909 (La.Sup.Ct., 1937). A majority of other jurisdictions look to loss-sharing as an essential element of partnership or joint venture, but Louisiana Courts have held that partners may contract for the risk of loss to be assumed by one or more of the partners exclusively. Sheridan v. LeQuire, 15 So.2d 118 (La.App., 1st Cir., 1943) ; Pollard v. Browder, 126 So.2d 310 (Fla.App., 1961) ; and O'Neal, An Appraisal of the Louisiana Law of Partnership, 9 La.L. Rev. 307, 321 (1949). Likewise, the parties may agree that the administration of the partnership or joint venture will be entrusted to one or more of the partners or joint venturers exclusively. LSA–Civil Code, arts. 2867, 2868, 2869 and 2870; Comment, The Business Joint Venture in Louisiana, 25 Tulane L.Rev. 382, 386, 387 (1951) ; O'Neal, An Appraisal of the Louisiana Law of Partnership, 9 La.L.Rev. 307, 359 (1949) ; Barnett v. Ludeau, 171 La. 21, 129 So. 655

law. See United States v. Ogilvie Hardware Co., 330 U.S. 709, 67 S.Ct. 997, 91 L.Ed. 1192 (1947) ; Flanders v. United

States, 172 F.Supp. 935 (N.D.Calif., 1959) ; and Tate v. Knox, 131 F.Supp. 514 (D.C., Minn., 1955).

(La.Sup.Ct., 1930); Shell Oil Co. v. Prestidge, 249 F.2d 413 (9th Cir., 1957); Landreth v. United States, 70 F.Supp. 991 (N.D.Texas, 1946).

Defendant, in striking at the very basis of the alleged joint venture agreement, that is, the contract itself, strenuously contends that the agreement between Frazell, Wheless and Woolf patently evidences a contract of employment from the terms of the instrument itself, pointing to language, for example, to the effect that " * * * Wheless and Woolf, jointly, as is hereinafter set forth, have and do hereby employ Frazell at their joint expense and on the following terms and conditions, * * *." References are also made in the contract to Frazell's "employment," his "monthly salary or drawing account," and the retention of powers of management and control in Wheless and Woolf.

In general, the legal relationship of the parties will not be conclusively controlled by the mere terms which the parties use to designate the relationship although the terms and language of the agreement are strong evidence tending to show that the relation actually existing conforms to the terms used by the parties. See annotation at 137 A.L.R. 6, 86, et seq. The ultimate criterion is whether the parties actually intended to enter into a joint venture and, in arriving at this determination, there are no hard and fast rules fixing the legal requisites. Each case must be considered sui generis and care must be exercised that consideration is given to the usages and practices characteristic of the particular commercial undertaking sought to be labeled a "joint venture." Hero & Co. v. Farnsworth & Chambers Co., Inc., 236 La. 306, 107 So.2d 650 (La.Sup.Ct., 1958), and Pillsbury Mills, Inc., v. Chehardy, supra.

We must look to the totality of evidence and not just the written agreement between the parties, to determine whether a joint venture was entered into. See Flanders v. United States, 172 F.Supp. 935 (N.D.Calif., 1959). As stated by the Fifth Circuit Court of Appeals in Haley v. Commissioner of Internal Revenue, 203 F.2d 815, 818 (5th Cir., 1953), even though it is expressly stated in the written agreement that the parties do not intend to enter into a joint venture or partnership, " * * * if the agreements and the conduct of the parties thereunder plainly show the existence of such relationship, and the intent to enter into it, it will nevertheless be held to exist for tax purposes." To the same effect is Universal Sales Corp. v. Calif. Press Mfg. Co., 20 Cal.2d 751, 128 P.2d 665 (Calif.Sup.Ct., 1942), and authorities cited therein.

Although the agreement of February 9, 1951, does contain some language indicative of an employer-employee relationship, the subsequent agreement among the identical parties which terminated the agreement of February 9, 1951, referred to the latter as a "joint venture agreement." In that agreement, Frazell agreed to transfer all of his interests in the properties acquired under the February 9, 1951, agreement to the W. W. F. Oil Corporation in return for 13% of the total 50,000 shares of stock in the corporation. Significantly, this reference to the first agreement as a "joint venture agreement" was made at an unsuspicious time, that is, long prior to the filing of federal income tax returns for the year 1955 and the later assessment by the Commissioner.

Looking to what the Louisiana Courts describe as "the usages and practices characteristic of the particular commercial undertaking sought to be labeled a 'joint venture,' " we have found, through our own research, several cases involving oil deals wherein similar contracts were interpreted and adjudged to be joint venture agreements.

In Kasishke v. Baker, 146 F.2d 113 (10th Cir., 1944), a case which we believe correctly sets forth the principles applicable here, the plaintiff, Baker, entered into a verbal agreement with defendant, Kasishke, which provided in substance that, in order to engage in the oil business, Kasishke would advance all of the necessary capital and render some

personal services while Baker would contribute his entire time in exchange for a nominal salary plus ten per cent of the profits. It was further agreed that after Kasishke recovered his capital expenditures, Baker would have a ten per cent interest in the properties. The Coralena Oil Company was organized by Kasishke and title to all the oil properties was taken in the name of the corporation. Forty-four shares of stock in the corporation were issued to Baker and his wife, and the balance were issued to Kasishke and his wife. Subsequently, the Olive Drilling Company was organized to drill wells for Coralena. The stock in this company was likewise held by Kasishke and his wife, except for one share issued to Baker to qualify him to serve on the board of directors. The oil venture was successful. The oil leases acquired became valuable and the properties began to "pay out," and in several years the properties were worth approximately $6,-000,000. Personal disagreements caused Baker and Kasishke to become estranged and Baker then brought suit for an accounting of the oil properties, alleging that, as a joint venturer with Kasishke, he was entitled to a one-tenth interest in the properties. Kasishke argued, however, as defendant does here, that Baker's interest in the properties was contingent and would arise only after the money advanced by Kasishke had been repaid and the properties had "paid out." Because those contingencies had not occurred, argued Kasishke, Baker could not share in the profits nor in the properties. In rejecting these contentions, the Court stated that although Baker's right to receive a return (in addition to his nominal salary) on his interest in the properties was contingent upon the properties "paying out" and recovery of the capital expenditures by Kasishke, Baker's interest in the properties vested from the moment the contract was entered into and did not depend, for its existence, upon any contingencies. Continuing, the Court said:

"  *  *  *  At the outset, Kasishke furnished approximately $300,000.

This was his main contribution to the business [which continued for approximately seven years]. Baker devoted all his time and energy to the management of the joint enterprise for which he received only a nominal salary. At the end of that time the properties had a value of approximately $6,000,000. We agree with the conclusions of the court that Baker's interest attached from the date of the contract, and that the profits were earned and only his right to receive returns was postponed until the conditions were fulfilled."

Particularly significant for purposes of analyzing this agreement is the following language from the Court's opinion:

"It is urged that the arrangement did not constitute a joint adventure. It is argued that this follows from the facts that Baker's interest was dependent upon the contingencies already noted; that there was no agreement to share the losses; that there was no equal right of management; that there was no joint interest in the property; that the contract was terminable at the will of either party; and that the enterprise was not limited to a specific venture.

"It is impossible to define the relationship of joint adventure with exactitude and precision. In many respects it is analogous to a partnership, the main difference being that a joint adventure is more limited in its scope of operations than a partnership. In the main, some of the relevant factors of a joint adventure are that there must be joint interest in the property; there must be an agreement, express or implied, to share in the profits and losses from the venture; there must be action and conduct showing co-operation in the property. It has been held that it is not absolutely necessary that there be participation in both profits and losses. In determining whether one shares in the losses, the fact that

one works for a nominal salary, thus losing a part of the value of his services, will be taken into account.
\* \* \* "

Concluding, the Court held that although the title to properties was held in the name of the corporations, it was in fact the property of Baker and Kasishke, and the corporations were merely acting as trustees for them.

In a companion case, Kasishke v. Keppler, 158 F.2d 809 (10th Cir., 1947), the plaintiff, a geologist, brought suit against the same defendant to recover a ⅟₁₆th interest in certain oil properties and for an accounting. The plaintiff had entered into an oral contract wih Kasishke whereby the plaintiff, as a skilled geologist, was to locate and recommend potential oil and gas producing properties to Kasishke for his approval. Upon Kasishke's approval, the properties were to be acquired and developed at Kasishke's expense, subject, however, to a recovery of expenses from development. For his services, Keppler was to receive $300 a month and ⅟₁₆th interest in the properties acquired after Kasishke had been reimbursed. The District Court found that Keppler was an experienced, qualified geologist and that at the time of the contract was capable of earning much more than the stipulated salary; that after the execution of the contract, Keppler devoted himself entirely to his duties; and that several blocks of leases had been acquired by Kasishke upon the recommendation of Keppler. The District Court held that the agreement between Keppler and Kasishke created a joint venture as a matter of law and that a constructive trust arose when Kasishke took the leases in his own name and when he refused to recognize Keppler's interest. Affirming the District Court's decision, the Court of Appeals held that the agreement between Keppler and Kasishke was indistinguishable from that between Baker and Kasishke (see Kasishke v. Baker, supra) and was, as a matter of law, a joint venture agreement.

We regard these two cases as indistinguishable in principle from the facts here. Particularly in Kasishke v. Keppler, aside from the fact that no written contract was involved there, the relationship between the geologist and the promoter was substantially the same as the relationship here between Wheless, Woolf, and Frazell. As explained in Kasishke v. Baker, the fact that one works for a nominal salary, thus losing a part of the value of his services, will be taken into account. See, also, Seymour v. Wildgen, 137 F.2d 160 (10th Cir., 1943), and Potucek v. Blair, 176 Kan. 263, 270 P.2d 240 (Kans.Sup.Ct., 1954).

In Potucek v. Blair, supra, the plaintiff, an experienced manager of independent oil companies, alleged that the defendant, an oil operator, became interested in his talents and engaged him in a joint venture for the acquisition and development of oil and gas properties; that the parties agreed for all properties to be held in defendant's name until such time as he was reimbursed for all monies advanced by him for acquisition and development of the properties; that plaintiff was to receive an interest ranging from ⅛th to ¼th in all properties acquired; that at some later date the parties would reduce their agreement to writing and after the defendant recovered all capital advanced, plaintiff would be assigned his specified interests in the properties; that, prior to assignment of his specified interests, plaintiff would draw a monthly salary of $375.00 (a smaller salary than he could have obtained elsewhere); and that, after defendant had breached the agreement and sold the properties, plaintiff received a "notice of termination of employment" but did not receive a portion of the proceeds of the sale.

Plaintiff, suing for specific performance of the oral contract, prayed for a determination that his agreement with defendant was for a joint venture and that he was therefore entitled to his specified interest in the proceeds from the sale of the properties. The Supreme Court of Kansas held that plaintiff had stated a cause of action for relief on the theory of joint venture as distinguished

from an employment contract. Pointing to plaintiff's contribution to the joint venture, the Court said: "Surely the acceptance by appellant of appellee's services for a period of years constitutes a valid consideration. Such services were as vital to the success of the venture as appellant's contributions of the physical properties or other capital." 270 P.2d at 245. Further, the Court noted that receipt of a nominal salary under the agreement constituted a real consideration to support the agreement. Citing Kasishke v. Baker, supra, the Court said that, although plaintiff's right to receive profits was postponed until the conditions were fulfilled, plaintiff's interest attached, at the time the oral agreement was made, to all leasehold interests the defendant then owned and to all others when they were procured.

For other examples of usages and practices characteristic of joint ventures in the oil industry, see Grannell v. Wakefield, 172 Kan. 685, 242 P.2d 1075 (Kans. Sup.Ct., 1952); Catlett v. Jordan, 206 Okl. 473, 244 P.2d 564 (Okla.Sup.Ct., 1952); Emerson v. Shirley, 188 La. 196, 175 So. 909 (La.Sup.Ct., 1937); Shoemake v. Davis, 146 Kan. 909, 73 P.2d 1043 (Kans.Sup.Ct., 1937). See, also, Kleinschmidt v. United States, 146 F. Supp. 253 (Mass., 1956) (patent engineer held joint venturer); Stricker v. Morgan, 158 F.Supp. 830 (S.D.Miss., 1958) aff. 268 F.2d 882 (5th Cir., 1959) (timber and land deal); Greenbaum v. Kirkpatrick, 129 F.Supp. 648 (W.D. Okl., 1955); and Flitch v. Boyle, 147 Kan. 600, 78 P.2d 9 (Kans.Sup.Ct., 1938).

As we have said already, a joint venture must rest upon joint contribution of capital, skill, time or labor by the parties thereto. LSA–Civil Code art. 2809, Succession of Melancon, supra. Here, Wheless and Woolf principally contributed their capital, whereas Frazell principally contributed his knowledge and experience as a geologist, his skill and information in the field, and devoted all of his time to the joint efforts of the parties in discovering and securing profitable oil, gas and mineral leases and interests. Frazell contributed most substantially to the enterprise by supplying geologic maps which, prior to entering into the agreement with Wheless and Woolf, were exclusively his own private property. Frazell stated on deposition that, from information contained in his maps, the W. W. F. Oil Corporation drilled 36 wells in the described areas and was successful in producing oil and gas from 27 of them. Only 9 resulted in dry holes. In the areas described by Frazell's maps, "considerable" royalty was purchased and a gasoline plant was built. The parties also instituted secondary recovery operations and accomplished "water flooding." Frazell testified undisputedly that his map which described the western section of Coleman County, Texas, was the basis of acquisitions and production which amounted to one-half of the total income and production enjoyed during the life of the agreement. Moreover, the fact that Frazell worked for a smaller salary or expense allowance than he could have obtained elsewhere, thus losing a substantial part of the value of his services, must be considered as a contribution to the enterprise. See Kasishke v. Baker, supra; Seymour v. Wildgen, supra; and Potucek v. Blair, supra.

Defendant argues, however, that the monthly compensation received by Frazell was a "salary" and therefore indicative of an employer-employee relationship. To the contrary and as explained by Wheless on oral deposition: "He had a drawing account; he was not to receive any compensation as salary; he was to get his entire profit out of this proposition by the results of the operation, but he had a drawing account, which was figured on the basis of what he thought and what we agreed would be a reasonable amount of living expenses for himself and his family." Although Frazell was not obligated to repay the amount he received monthly in the event the operations were not successful, he did subject himself to the risk of losing his time, efforts, skill, knowledge, and geologic in-

formation. In other words, Frazell stood to lose these things, valuable things, whereas Wheless and Woolf stood to lose their capital investments and the limited time they devoted to the enterprises.

In Summers v. Hoffman, 341 Mich. 686, 69 N.W.2d 198, 48 A.L.R.2d 1033 (Mich.Sup.Ct., 1955), the Supreme Court of Michigan stated in a similar joint venture context: "Both made a contribution: plaintiff contributed his time, skill and supervision, while defendants contributed the capital. * * * But defendants claim that under the agreement plaintiff would not share any losses or bear the risk of loss in case of an adverse decision in the suit involving the title to the property. With this contention we cannot agree. *'Loss' does not necessarily mean actual 'monetary loss.'* If the land was eventually sold at a loss the result would be that *plaintiff's expenditure of time would have been for nought as would defendants' monetary investment.* If the title litigation had been decided adversely then plaintiff would have lost large out-of-pocket expenses and the value of the time which he had theretofore spent on the project which, while not quite as concrete or measurable as defendants' cash investment, is nevertheless a loss. It cannot be said that the plaintiff did not share any risk of loss, * * *." (Emphasis added.) Likewise here, Frazell stood the risk of losing his time and efforts for which he had received only nominal compensation prior to the success of the venture, whereas Wheless and Woolf stood to lose their capital investments. See Sample v. Romine, 193 Miss. 706, 8 So.2d 257, 9 So.2d 643, 10 So.2d 346 (Miss.Sup.Ct., 1942).

Defendant contends that Frazell did not participate in the management and control of the enterprise and that sole authority was vested in Wheless and Woolf under the agreement. Notwithstanding the rule that management and control of a joint venture may, under Louisiana law, be entrusted to one or more of the joint venturers exclusively, the evidence and depositions fail to bear out defendant's contentions. LSA–Civil Code arts. 2867–2870; Comment, The Business Joint Venture in Louisiana, 25 Tulane L.Rev. 382, 386, 387 (1951); O'Neal, An Appraisal of the Louisiana Law of Partnership, 9 La.L.Rev. 307; 359 (1949); Barnett v. Ludeau, supra; Shell Oil Co. v. Prestidge, supra; and Landreth v. United States, supra. Explaining the extent of Frazell's authority and managerial discretion in performing his part of the venture, Wheless stated on oral deposition:

"A Actually, Mr. Frazell had quite a lot of authority and jurisdiction in this situation; to start out with, I think he used to refer practically everything back over here to us; however, even in the beginning, my recollection is that he had a $10,-000.00 bank account subject to his check withdrawal, disbursements, and he had authority to spend up to $5,000.00 in any one transaction without referring it to this office, but that anything over and above that in any one transaction, well, he was supposed to take it up with us and get authority for expenditures. Right at first, I think, perhaps he didn't use that $5,000.00 margin of authority that he had, but later on, why, we probably extended the $5,-000.00 and we just would leave the thing more or less up to him because, actually, that was what we had in mind when we went in and got Dick to do this thing. We were sitting over here in Shreveport and Abilene, Texas was 400 miles away over there, and he was on the ground and on the job and, practically speaking, we very much preferred for him to run it than to come to us.

* * * * * *

"A He could use that $5,000.00 to—he could spend up to $5,000.00 on any one transaction without referring it to us.

"Q Yet, at the same time now, both you and Mr. Woolf were the only ones who made a decision as to

whether or not you would acquire property; you did have that power? "A No, sir; he could use that $5,000.00 to acquire property."

An agreement whereby Frazell would submit acquisitions amounting to more than $5,000.00 to Wheless and Woolf for their approval is entirely reasonable in light of the fact that the latter two were supplying the capital for the acquisitions. Being far removed from the actual operation of discovery and acquisition, they understandably desired to retain some measure of control over Frazell's transactions. On the other hand, Frazell was the party making the acquisitions and he presumably would not have negotiated for the leases had he not thought them to be potentially profitable. This in itself was an exercise of discretion. Moreover, Frazell had complete authority to spend up to $5,000.00 on any one transaction without securing the approval of either Wheless or Woolf. We believe, therefore, that Frazell shared in the management and control of the enterprise to a reasonable extent under the circumstances. The fact that title to the properties was held in the names of Wheless and Woolf matters not for the reasons explained in Kasishke v. Baker, supra; Kasishke v. Keppler, supra; and Potucek v. Blair, supra. This was merely an arrangement of convenience and form, probably intended to protect Wheless and Woolf and simplify transactions. As between the parties to the agreement, Frazell's interest in the properties existed regardless of where title was placed.

Hypothetically, if Wheless, Frazell and Woolf had expressly agreed on all the typical incidents either of a joint venture or of an employment contract, and would have, in addition, described their relation in the correct legal terms, no question as to the distinction between joint venture and employment would have arisen. As a matter of fact, however, the parties did not expressly regulate all the incidents of their legal relationship, and, moreover, the express provisions of their contract, if considered separately, were typical, some of a joint venture and others of an employment relation. Viewing the agreement as a whole and the conduct of the parties in the light of the usages and practices characteristic of joint ventures in the oil industry, we conclude that the agreement of February 9, 1951, constituted a joint venture as distinguished from a contract of employment. Haley v. Commissioner, supra; and Hero & Co. v. Farnsworth & Chambers Co., Inc., supra.

It follows, therefore, that, upon termination of the joint venture between Frazell, Wheless and Woolf and the creation of the W. W. F. Oil Corporation, the transaction whereby Frazell received the shares of stock in the corporation in exchange for his interest in the properties subject to the joint venture agreement constituted a tax-free exchange of "property" for stock within the meaning of Section 351(a).

For these factual reasons, and on the basis of the authorities cited, there will be judgment for plaintiffs as prayed.

A proper decree should be presented.

## APPENDIX

STATE OF LOUISIANA }
PARISH OF CADDO }

THIS AGREEMENT made and entered into by and between N. H. WHELESS OIL COMPANY, a partnership herein represented by N. H. Wheless, its Managing Partner, (hereinafter sometimes referred to as "Wheless"), W. C. WOOLF (hereinafter sometimes referred to as "Woolf") and W. D. FRAZELL (hereinafter sometimes referred to as "Frazell"), all residents of Shreveport, Caddo Parish, Louisiana,

### WITNESSETH: THAT

WHEREAS, Wheless and Woolf are each separately engaged, among other things, in the drilling for and production of oil, gas and other minerals and, in the furtherance of their business, desire to acquire, develop and operate properties for the production of oil and gas and to

further their respective interests in connection with the acquisition, development and operation of such property as may be acquired by the said Wheless and Woolf, jointly, as is hereinafter set forth, have and do hereby employ Frazell at their joint expense and on the following terms and conditions, but subject to the right to terminate such employment, all as is hereinafter set forth.

NOW, THEREFORE, the parties do hereby agree and contract, one with the other, as follows:

## I.

Wheless and Woolf do hereby employ Frazell and Frazell does hereby accept said employment and agree to devote his entire time to carrying out the purposes of his employment, as set out under the terms and provisions of this agreement, and to such other purposes as may be specified from time to time by the said Wheless and Woolf.

## II.

Frazell is to go into areas jointly designated by Wheless and Woolf with the view of checking such areas to determine whether or not there can be obtained for Wheless and Woolf oil, gas and mineral leases, mineral rights or royalties likely to be productive of oil and/or gas and, if within said areas Frazell locates any acreage that is in his opinion likely to produce oil and/or gas, he is to attempt to obtain, respectively, contracts for the acquisition of leases or the purchase of mineral rights or royalties and to submit same, together with the geological data thereon, to Wheless and Woolf.

Upon the joint approval of Wheless and Woolf to the acquisition of any such interests, Frazell shall, at the price and on the terms and conditions specified jointly by Wheless and Woolf, attempt to acquire such interests, and, should he be successful therein, the title to all such interests shall be taken one-half (½) in the name of Wheless and one-half (½) in the name of Woolf and the consideration to be paid therefor and all costs of developing and operating same shall be borne one-half (½) by Wheless and one-half (½) by Woolf.

There shall be no obligation on the part of Wheless and Woolf to purchase property or to act on the advice and recommendation of Frazell and, should Wheless and Woolf desire not to do so or to defer action on the purchase of any properties, Frazell shall not be entitled to purchase for his own account or to offer the properties to others without first obtaining the written consent of Wheless and Woolf to so offer same.

It is agreed, however, that should either Wheless or Woolf desire to purchase any of the properties submitted by Frazell and the other party not wish to join in the acquisition thereof, then Wheless or Woolf, as the case may be, may individually acquire such properties without the joinder of the other party and the properties so acquired shall belong to the purchaser thereof, but Frazell shall be entitled to the interest hereinafter specified to be acquired by him in such properties and his interest shall accrue when all costs and expenses, as hereinafter specified, have been returned to the purchaser from all properties purchased by such purchaser in which Wheless or Woolf, as the case may be, did not participate in the acquisition thereof.

It is further agreed and understood that Wheless and Woolf, or either of them, shall have the right to purchase any properties investigated by Frazell, but, in the event Frazell does not wish to ultimately acquire an interest in the properties as hereinafter specified, he shall at the time said properties are submitted to Wheless and Woolf so state that he does not wish to acquire an interest in such property and, should Wheless and Woolf, or either of them, acquire such property, same shall be acquired free of any interest or claim of Frazell and Frazell shall not be charged with any costs and expenses in connection therewith.

## III.

It is agreed that the compensation to be received by Frazell shall be advanced

and/or paid one-half (½) by Wheless and one-half (½) by Woolf. Such compensation shall be as follows:

A. Frazell shall receive a monthly salary or drawing account of Six Hundred Seventy Five and No/100 (675.00) Dollars, plus the return of his ordinary traveling expenses while away from his domicile, plus any amounts which he may have advanced as expenses for his employers.

Said salary or drawing account, plus expenses, as above set forth, shall be charged against operations and shall be treated as an expense in connection with the operation of the properties acquired under the terms of this contract in the same manner as would be the salaries and expenses of any non-participating employee, and, except with the joint consent of Wheless and Woolf, Frazell shall have no right to draw or receive any other monies other than the above stated salary and expenses.

B. In addition to the monthly advances provided to be made to Frazell under Paragraph A above, Frazell shall be entitled to the hereinafter specified interests in all properties jointly acquired by Wheless and Woolf under the terms and provisions of this agreement. It is agreed, however, that Frazell shall not be entitled to, nor shall he be considered as owning, any interest in said properties until such time as Wheless and Woolf shall have recovered their full costs and expenses of said properties. In order to compute costs and expenses and recoveries from said properties, as used for the purpose of computing Frazell's so-called "interest", the following shall be applied:

1. The sum of the following:

(a) Acquisition costs of all properties acquired hereunder, including brokerage fees, plus

(b) All expenses directly allocated to said properties, plus

(c) Overhead expenses, including but not limited to Frazell's salary, salaries of any employees assigned to or used in either Wheless' or Woolf's departments or their operations and, plus

(d) Any other costs and expenses that should reasonably be charged against such acquisitions and operations.

2. From the sum of the foregoing costs and expenses listed under paragraph 1. deduct the sum of the following recoveries:

(a) Proceeds of sale of properties acquired hereunder, plus

(b) Receipts from lease bonuses, rentals, royalties, sales of production and, plus

(c) Any other income and offsets that should be reasonably credited to said properties and operations.

When the above conditions with reference to the return of the total amount of costs and expenses have been so received by Wheless and Woolf, Frazell shall, thereupon, become entitled to the hereinafter specified interests in any properties acquired by Wheless and Woolf under the terms and provisions of this contract which have not been disposed of by them prior to the time that Frazell becomes entitled to his said interests, to-wit:

1. On leases acquired on wildcat trade-out drilling blocks:

(a) Where acreage costs, including drilling and all other costs and expenses, total an average of less than $100.00 per acre ------------------------ 4/16

(b) If total average costs, as defined in (a) above, are $100.00 or over, but less than $200.00 per acre ---------------------- 3/16

(c) If total average costs, as defined in (a) above, are $200.00 or over per acre -------------- 2/16

2. On leases purchased for protection in contemplation of other parties' de-

velopment, the following interests shall apply:

(a) On acreage costing $25.00 per acre or less, including commission, ------------------------ 4/16

(b) Over $25.00, up to and including $75.00 per acre ---------- 3/16

(c) Over $75.00, up to and including $150.00 per acre ---------- 2/16

(d) Over $150.00 per acre -------- 1/16

It is agreed and understood that the interests to be acquired by Frazell in each instance above specified shall be the said fraction of the interest acquired by Wheless and Woolf; it being particularly agreed and understood, however, that on any lease so acquired by Wheless and Woolf, where under the terms of such lease or any assignment thereof, including the assignment whereby same is acquired by Wheless and Woolf, the royalty is greater than one-eighth ($\frac{1}{8}$) of the production, or where by such lease or assignment an overriding royalty rests against such lease or leases, the interest to be acquired by Frazell, as above specified, shall be reduced by three-fourths ($\frac{3}{4}$) of the same fraction as the amount of such royalty which exceeds one-eighth ($\frac{1}{8}$) or such overriding royalty, with the understanding, however, that in no event shall Frazell's interest in any such lease be reduced to less than a one-thirty-second ($\frac{1}{32}$) of the interest acquired by Wheless and Woolf.

In the event that any such lease or leases are burdened with an oil or production payment, these same provisions above specified for excess or overriding royalties shall apply to Frazell's interest, until such time as such oil or production payment has been discharged.

3. On mineral or royalty interests acquired by Wheless and Woolf under the terms of this contract where the cost per acre, not including commission, is less than $500.00 per acre ---- 1/8 of interest so acquired

4. If costs of such mineral or royalty interests are $500.-00 or more per acre, not including commission, ------ 1/16 of interest so acquired

It is particularly agreed and understood that Wheless and Woolf shall have the right to acquire properties, either jointly or individually, free from any of the terms of this contract and Frazell shall only be entitled to the above specified interests on those particular properties on which he investigates and submits a recommendation that such properties be acquired and, further, his right to so acquire an interest shall only apply to properties acquired prior to the termination of this contract.

## IV.

It is agreed and understood that the costs and expenses referred to shall be computed on all of the properties and not on any individual property and, when and if Wheless and Woolf shall have recovered all amounts expended by them under the terms of this contract on all of the properties acquired under the terms of this contract, plus any amounts for which they are liable in connection with the acquisition, development, producing or operation of said properties, so that they have been completely repaid for all items expended, advanced or charged to them in connection with said properties, including taxes, then Frazell shall be entitled to and, upon his request in writing to Wheless and Woolf, they shall assign unto him his above specified interest in those properties which they still own that were acquired under the terms of this contract and, thereafter, Frazell shall be entitled to that portion of the production allocated or accruing to the interests so acquired by him and shall monthly advance and pay his proportionate part of all costs incurred in further developing, operating, producing, transporting and marketing the production from said property, plus a reasonable charge for overhead costs and expenses;

the operation of said properties, however, to remain under the control and management of the said Wheless and Woolf.

Should there be any outstanding indebtedness or encumbrance against any of the properties in which Frazell acquires an interest under this contract, Frazell shall assume and pay his proportionate part of such indebtedness as same comes due from his proportionate part of the production from the properties assigned to him.

Should there be in the hands of Wheless and Woolf any profits which have accrued from the operation of the properties at the time they assign unto Frazell the above specified interest in properties acquired under the terms of this contract, they shall, at the same time, pay over to Frazell his percentage of said profits, same being based on the interest assigned to him in the particular property from which same arises.

### V.

It is particularly agreed and understood that, until such time as Frazell may receive his assignment from Wheless and Woolf, Wheless and Woolf shall have the absolute right to sell, manage, mortgage, encumber, release and/or dispose of any and all of the properties acquired under the terms of this contract, but should Wheless and Woolf, through said sales, sell all of the properties acquired under this contract or more than a sufficient amount of said properties to repay them all amounts due to them under the terms of this contract, then Frazell shall be entitled to his proportion of the net profits derived from any such sale.

### VI.

It is agreed and understood that, until such time as Frazell has been assigned the above specified interests in properties acquired under this contract, he shall not have the right to dispose of any rights which may accrue to him hereunder and same shall be considered as a personal contract.

It is understood and agreed, however, that, upon title vesting in Frazell of his interest in the properties as hereinabove provided for, Frazell may, subject to the following option, sell all of his interest in a particular property or in all properties, but before making any such sale, Frazell shall first give Wheless and Woolf, or the one of them who is the owner of the remaining interest acquired under this contract, sixty (60) days' prior written notice of his intention to sell such property or properties, stating in said notice that he has a purchaser willing and able to buy and furnishing evidence by attaching a complete and exact copy of the prospective purchaser's offer setting forth clearly and in detail the price and terms offered and the name of the purchaser. Wheless and Woolf, if they are the joint owner, or either of them if both do not elect to purchase, shall have the right and option for a period of sixty (60) days within which to purchase the interest so proposed to be sold by Frazell at the price and on the terms set forth in said notice. Should both Wheless and Woolf elect to purchase said interest, the same shall be acquired in equal proportions. Should one of said parties not desire to purchase and the other elect to purchase said interest, he shall have the right to purchase the entire interest to be so sold. If the interest to be sold is only owned jointly by Frazell with either Wheless or Woolf, then only Wheless or Woolf, the joint owner with Frazell, shall have the option to purchase as is set forth in this paragraph.

In the event both Wheless and Woolf, or either of them, elect to purchase said interest, they shall notify Frazell in writing on or before the expiration of sixty (60) days from the receipt of notice from him and, upon receipt of such notice by Frazell, he shall immediately deliver an assignment to said Wheless and Woolf, or the one electing to purchase same, and such purchaser shall pay over to Frazell the purchase price for such interest.

Should Wheless and/or Woolf not elect to purchase Frazell's interest, as above specified, then Frazell shall be free to sell such interest so designated in the above

referred to notice to the purchaser designated therein at the price therein specified, provided said sale is consummated within sixty (60) days from the date it is determined that Wheless and/or Woolf will not elect to purchase same, but said sale shall only be made to the party designated in said notice and then only on the terms and conditions as above specified.

### VII.

It is especially agreed and understood that any party to this contract shall have the right, at any time, to terminate same by giving the other parties hereto thirty (30) days' prior written notice of his intention to so terminate same.

Upon such termination, Frazell's right to receive any further salary, drawing account or expenses shall cease and Frazell shall have no right to participate in properties thereafter acquired by Wheless and Woolf, or either of them, but Frazell shall retain the right to receive his interest in those properties previously acquired under the terms of this contract, when Wheless and Woolf have had returned to them all costs and expenses as hereinabove specified, and Wheless and/or Woolf, as is specified in Paragraph VI hereof, shall in like manner have the right and option to buy such interests of Frazell as he may desire to sell, all on the terms and conditions as are set forth in said Paragraph VI hereof.

IN WITNESS WHEREOF, this agreement is executed in triplicate originals on this the 9th day of February, A.D.1951.

N. H. WHELESS OIL COMPANY

By: /s/ N. H. Wheless

Managing Partner

/s/ W. C. Woolf

W. C. WOOLF

/s/ W. D. Frazell

W. D. FRAZELL

WITNESSES:

/s/ M. L. Kinne

/s/ R. L. Berryman