424 So.2d 435 (1982)
HUFFMAN TECHNICAL DRILLING, INC.
v.
SMITH, et al.
CAYMAN EXPLORATION CORPORATION
v.
EMERALD DIRECTIONAL DRILLING, CO., INC., et al.
Nos. 5-249, 5-250.
Court of Appeal of Louisiana, Fifth Circuit.
December 9, 1982.
*436 Armentor & Wattigny, Gerard B. Wattigny, New Iberia, for plaintiffs-appellants.
Koury & Koury, Joseph A. Koury, Lafayette, for defendants-appellees.
Before BOUTALL, GAUDIN and GRISBAUM, JJ.
GRISBAUM, Judge.
This is an appeal from a concursus proceeding filed by Cayman Exploration Corporation impleading Emerald Directional Drilling Company, Inc., Huffman Technical Drilling, Inc., Forrest Wayne Smith, and John Huffman. Cayman deposited $41,742.50, which included $2,000.00 in attorney's fees, in the registry of the court after liens were filed by the competing interests of Forrest Wayne Smith d/b/a Emerald Directional Drilling and John Huffman d/b/a Huffman Technical Drilling, Inc. Directional Drilling, Inc. intervened in the matter for the amount of $3,148.84. The trial court dispersed the concursus funds as follows:
(1) Huffman Technical Drilling, Inc. in the amount of $3,726.00;
(2) Directional Drilling, Inc. on its intervention in the amount of $3,148.84;
(3) Emerald Directional Drilling awarding it the balance of the original deposit made by Cayman which included the $2,000.00 in attorney's fees;
(4) Interest was awarded proportionately on all sums from the time the amount deposited in the registry of the court began to earn interest;
(5) Defendants and intervenor were to bear costs proportionately.
*437 The funds dispersed to Directional Drilling, Inc. are not contested by any of the parties. John Huffman appeals from the allocation of the amounts to Huffman Technical Drilling, Inc. and Emerald Directional Drilling, Inc. contending that there was a business agreement between Forrest Smith and himself to do directional drilling on the Cayman well, and, therefore, the amounts dispersed in the concursus proceedings were incorrect. We reverse and remand.
Two issues are presented by this controversy:
(1) Whether an agreement was reached to form a business?
(2) If an agreement was reached, what is the nature of the business relationship formed?
In late October 1978 Forrest Smith and John Huffman began discussions concerning the formation of a directional drilling corporation known as Emerald Directional Drilling, Inc. They visited an attorney who was instructed to form and file articles of incorporation. In his depositional testimony, this attorney stated there was to be a one-half and one-half distribution of stock between the two men. In the meantime, Forrest Smith's engineering firm, Emerald Engineering, Inc., obtained a contract with Cayman Exploration for the drilling of a well in St. James Parish. This engineering company was in charge of the entire drilling operation; however, directional drilling for the job was to be done by Emerald Directional Drilling.
In early November Mr. Smith and Mr. Huffman flew to Los Angeles to discuss the Cayman project with Cayman executives. They made a trip to Houston to speak with Jim Graham who was Cayman's vice president of engineering and operation and also Cayman's representative to oversee the entire drilling operation at the site in St. James Parish. In his deposition Mr. Graham testified Huffman was introduced to him prior to the drilling as the person to take care of all of the directional drilling on the Cayman job. Graham's impression was that Huffman had the expertise and the tools to perform the directional drilling and that Huffman and Smith were partners. He remembered that Huffman was introduced to him as Smith's partner and that Smith and Huffman were forming a company, Emerald Directional Drilling, Inc. At that time, Mr. Graham was given a card with John Huffman's name on it as president of Emerald Directional Drilling. According to Graham, Emerald Engineering, Inc. was the consultant engineering firm for the Cayman job. Graham testified that Emerald Directional Drilling was employed through Emerald Engineering Company and not directly by Cayman. Graham testified that Huffman visited him in Houston a second time in order to finalize a contract with a drilling contracting firm.
In early November Huffman withdrew $5,000.00 from his company, Huffman Technical Co., and opened a checking account under the name of Emerald Directional Drilling. A check cashing card was signed by Smith, Smith's wife, Huffman, and Huffman's wife; however, the bank never received the card.
Drilling on the Cayman well began in November. Initially, John Huffman supervised the directional drilling. However, in early December Huffman had a problem with an infected hand which required hospitalization and caused him to be away from the job site. It seems about this time the two men had a disagreement. Huffman testified he still supervised the operations from his hospital room and later went to the job site on several occasions. Smith, on the other hand, testified that after a disagreement between himself and Huffman in late November, Smith "fired" Huffman from the Cayman job. He testified that Huffman did no more work after the end of November. There is conflicting testimony as to the work done by Huffman in December. Huffman testified he continued to supervise the well throughout December. He became aware of a change in the relationship between himself and Smith in mid-December but continued to work on the job out of a sense of duty to fulfill his obligation to Cayman. He made several trips out to the job, and on one such trip in late December he spoke to Mr. Graham who had flown in to inspect the job.
*438 Smith negates Huffman's participation in the drilling after the end of November. He urged at trial that Huffman's services were not longer needed after the end of November since Smith felt he was capable of supervising the entire drilling along with the participation of another employee, Lee Dubois.
Huffman testified that he withdrew a salary of $3,500.00 from the $5,000.00 in the account of Emerald Directional Drilling. He also withdrew from this account sums for his expenses for travel, hotels, and meals accumulated during the Cayman project.
Smith and Huffman also dispute the use of Huffman's tools on the Cayman job. It was originally agreed that Huffman's tools would be used for directional drilling. It appears from the record Huffman's tools were used during most of the drilling. Huffman contended that he attempted to remove unused tools which were on the job site, but Emerald Engineering employees, obeying instructions of Smith, would not allow this. Smith testified he did not limit Huffman in removing these tools, and, in fact, ordered the removal himself. However, Huffman's testimony is buttressed by that of Graham who stated that during his visit in late December he found unused tools on the job site and inquired as to their presence. He was told by employees that Smith had not allowed Huffman to remove these tools. Graham at that time ordered the removal of the tools in question.
The directional drilling on the Cayman well was completed in late December. In early January, Forrest Smith incorporated Emerald Directional Drilling alone. Thereafter, a dispute arose between Smith and Cayman concerning the reimbursement for services performed, and the newly formed Emerald Directional Drilling, Inc. filed a lien against Cayman. Shortly thereafter John Huffman filed two liens against Cayman. One lien was against Cayman by John Huffman d/b/a Emerald Directional Drilling and/or Huffman and Smith as partners of Emerald Directional Drilling. The second lien was on behalf of Huffman as president of Huffman Technical Drilling, Inc. In response to these liens, Cayman filed this concursus suit in which Directional Drilling, Inc. intervened. Huffman Technical Drilling, Inc. also filed a writ of attachment against Forrest Smith's interest in the concursus proceeding alleging that Smith was a non-resident. Huffman in this suit alleged that a loan of $5,000.00 was made to Emerald Directional Drilling, Inc. for which Huffman requested reimbursement from Smith's proceeds in the concursus proceeding. This attachment suit was consolidated with the concursus proceeding for trial on the merits.
After trial on the merits, the trial court ruled in favor of Cayman discharging the corporation from any further responsibility. It awarded the bulk of the deposit to Emerald Directional Drilling, Inc. and a small amount to Huffman Technical Drilling, Inc. for tool rentals. Huffman appeals this disbursement.
It is clear these two men did agree to form a business together. While short lived, a relationship existed on one project, the directional drilling on the Cayman well. We characterize the nature of this business relationship as a joint venture because a joint venture is an undertaking by two or more persons to combine their property, capital, labor, or skill in any combination of these elements in the conduct of a particular line of trade or general business for joint profits, thus creating the status of a partnership, although the facts may not show a formal partnership. See, Ault & Wiborg Co. of Canada v. Carson Carbon Co., 160 So. 298, 300 (La.1935); Frazell v. United States, 213 F.Supp. 457, 462 (W.D.La.1963) revd on other grounds 335 Fd 487 (5th Cir.1964). Thus, joint ventures are likened to partnerships and are governed generally by the same rules. Frazell v. United States, supra. The following partnership rules are applicable to our determination. Louisiana Civil Code article 2801 applicable in 1978 defined a partnership as a "... synallagmatic and commutative contract made between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill or industry, furnished in determined proportions *439 by the parties." Both a joint venture and partnerships stem from a contract, express or implied, between the parties who must, as between themselves, have intended to form a partnership or joint venture. See Frazell, supra. Essential to the relationship of a joint venture or partnership is a sharing in the profits of the enterprise as well as a sharing of control or management of the affairs of the enterprise. Frazell, supra. Importantly, as noted in Frazell, "[t]he ultimate criterion is whether the parties actually intended to enter into a joint venture and, in arriving at this determination, there are no hard and fast rules fixing the legal requisites. Each case must be considered sui generis ..." Frazell, 213 F.Supp. 457, 463.
Although there were no reasons for judgment, the trial court's judgment allocating only tool rental to John Huffman and the remaining amount to Emerald Directional Drilling indicates that it found no partnership, joint venture, or any other kind of business relationship between Mr. Smith and Mr. Huffman. We find this clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). The record indicates that there was an agreement between Forrest Smith and John Huffman. We find that Smith and Huffman did form a directional drilling company. This company's first job was the directional drilling on the Cayman well for which Smith's Emerald Engineering firm was the engineering consultant firm.
Smith contends that this company was never formed with Huffman, that he was merely testing Huffman to see if he wanted to later associate with Huffman, and that Huffman was an employee of Emerald Engineering, Inc. which he terminated after only a few days' work on the Cayman job. The record reflects that Huffman was considered from the start as more than a mere employee and that a business arrangement was formed in November of 1978 whether considered as a joint venture, an association, or a partnership. Both parties had unique attributes to bring to the "business." Forrest Smith had the Cayman job through his engineering firm, Emerald Engineering, Inc. However, Smith had no particular expertise in directional drilling; this John Huffman offered. The facts indicate that not only did Huffman supervise the directional drilling on the Cayman job, but he also provided important business connections with other tool rental companies and supplied through his Huffman Technical Corporation, a needed franchise that allowed the rental of equipment for the Cayman job. Huffman put $5,000.00 in a banking account and designated the account as Emerald Directional Drilling. A signature card was signed by all parties although never returned to the bank. Smith's own testimony is that he could not initially put up $5,000.00 because he lacked cash resources but had intended to do so as soon as the monies from the Cayman project were realized. A mere employee would not open a checking account under another name and draw his salary from it.
Other facts also support the finding of a business arrangement. Huffman was introduced to Cayman's executives in Los Angeles and the job supervisor, Graham, in Houston, as Smith's partner for directional drilling work. Moreover, Huffman visited Houston on two occasions to discuss the Cayman well. Bill Graham, Cayman's vice president of engineering and operation and Cayman's supervisor for the whole drilling operation, testified that he understood Huffman and Smith to be partners and that Huffman was to supervise the directional drilling on the Cayman well. Smith and Huffman had business cards printed with John Huffman as president of the company, Emerald Directional Drilling, Inc., which were presented to Graham in late October. Huffman also invoiced Emerald Engineering, Inc. for the entire job including rental on his tools and other companies' tools as well as his salary. This is consistent with Graham's testimony that Emerald Directional Drilling was working under Emerald Engineering, Inc. and not Cayman. Only when Huffman did not receive funds from Emerald Engineering, Inc. did he invoice Cayman directly. Importantly, Huffman was never paid as an employee of Emerald Engineering. He was, in fact, not paid at all for his services. If an employee of Smith, Smith would have at least paid *440 him for the days he worked in November on the Cayman well before his so called "termination." Other facts which also indicate that Huffman was not an employee of Smith's but Smith's equal (in this new business) are Huffman's contribution of the Huffman Technical Drilling's franchise in order for Emerald Directional Drilling to rent Dyna-Drill tools and finally Huffman's paying for Dyna-Drill rental on the Cayman job. The above facts indicate that there was a mutual agreement; there was a disagreement, and their association was shortlived. We find they in fact agreed to do the Cayman job together; therefore, we must recognize Huffman's participation in this business endeavor; we find this to be on a 50-50 basis.
For the reasons assigned we reverse and remand for the specific purpose of determining each participant's expenses and contributions, and after determining the above, distributing the profits accordingly.
REVERSED AND REMANDED.