RICHARD O. WHEELER and BETTY P. WHEELER, Petitioners/ v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wheeler v. Commissioner
Docket No. 6482-73.
United States Tax Court
T.C. Memo 1978-208; 1978 Tax Ct. Memo LEXIS 305; 37 T.C.M. (CCH) 883; T.C.M. (RIA) 780208; June 7, 1978, Filed *305 Petitioner and another entered into an agreement whereby they joined together to develop real property. Petitioner was to provide the know-how, the other party was to provide the capital. Held: Petitioner was a joint venturer entitled to report his share of proceeds from a sale of the developed real property as his share of joint venture capital gain. Held,further: The fair market value of stock, debentures, and a note determined. Fenelon Boesche and James Littleton Daniel, for the petitioners. G. Phil Harney, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: The Commissioner determined the following deficiencies in petitioners' joint Federal income tax: Year
Deficiency
1968
$68,999.26
1969
94,607.93 In an amendment to the answer the Commissioner asserted an alternative deficiency of $140,783.76 for the year 1968 should this Court find a certain stock transaction to be taxable in that year rather than in the taxable year 1969. This alternative deficiency for 1968 would result in a reduced deficiency for the year 1969. Certain concessions having been made, the issues remaining for our decision are: (1) whether certain stock, debentures and a note received *306 by petitioner Richard O. Wheeler in the taxable year 1968 constituted compensation for services or a distributable portion of joint venture capital gain; (2) whether restrictions on the stock received prevented income realization in the year of receipt; (3) the fair market value of the stock, if any, on the date of receipt; (4) the fair market value of the debentures and the note on the date of receipt; and (5) whether petitioners, by amendment to their petition, made a timely election under section 1304(a) [1] of the Internal Revenue Code to have the benefits of the income averaging provisions apply. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts along with attached exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Tulsa, Okla., at the time of filing their petition herein. They filed joint Federal income tax returns for the calendar years 1968 and 1969 with the Internal Revenue Service Center in Austin, Tex. Since Betty P. Wheeler is a party hereto solely by reason of having filed joint income tax returns *307 with her husband for the years in issue, Richard O. Wheeler alone will hereafter be referred to as the petitioner. In 1958 petitioner went into the real estate development and construction business building warehouses, churches, and small shopping centers. In some of these real estate projects petitioner had an ownership interest in the property being developed and in others he did not. It was in early 1961 that petitioner first met Ainslie Perrault. Although Mr. Perrault had no experience as a real estate developer, he was a very successful businessman, having owned a variety of business interests. Petitioner sought out Mr. Perrault to obtain financing for a project petitioner was contemplating. At that time petitioner had an option to purchase a tract of land and a lease commitment from National Cash Register Company for a building to be constructed on the land. What petitioner needed from Mr. Perrault was the front money necessary to exercise the option. Mr. Perrault agreed to provide the funds in return for a 50 percent interest in the project. Petitioner thereafter took title to the land in his name and followed through with the construction and leasing of the building. *308 The project ultimately proved successful. The next project in which the parties joined involved remodeling the Skelly Oil Building. This time Perrault initiated the project and requested that petitioner join forces with him. Perrault again offered to finance the project if petitioner would agree to remodel and acquire tenants for the building. The parties agreed to divide the profits on a 90 percent - 10 percent basis. The building was remodeled, leased, and eventually sold to the Franklin Realty Company in Philadelphia at a profit. After these two successful ventures, Perrault and petitioner decided to seek other projects that were larger in scope. In 1962 a general oral agreement was entered into under which Perrault was to provide the necessary front money for the projects and petitioner was to undertake to carry them through the financing, construction and occupancy phases. The essential term of the agreement was that profits would be divided 75 percent to Perrault and 25 percent to petitioner after Perrault recovered his investment plus a 6 percent interest factor. Petitioner was also to receive a salary of $700 per month (later raised to $1,000) as part of the agreement. *309 Perrault was to absorb overall losses incurred on the projects undertaken; however, if an individual project ran a loss while the venture was operating at a profit, the loss was to be shared in the profit ratio previously indicated. The association between petitioner and Perrault was a marriage of capital and know-how. Subsequent to this general arrangement between the principals, they began to look for new ventures. It was agreed that Perrault would hold legal and record title as nominee in order to protect his investment in the projects. However, petitioner and Perrault held themselves out as co-owners for the years during which the oral agreement and a later written agreement were in effect. In 1965 petitioner and Perrault confirmed their 1962 verbal agreement in writing. Petitioner requested the written agreement for several reasons. Prior to 1965 Mr. Perrault had been represented by petitioner's brother, presumably as his attorney. As a result, petitioner felt safe with a verbal agreement. However, petitioner's brother died and petitioner thereafter felt a written agreement was necessary to protect his interest in the projects. Also Perrault was in his middle or upper *310 sixties at that time and petitioner felt he would be better protected with a written agreement. While petitioner was not totally satisfied with the agreement as written, he felt he had lost much of the earlier leverage which he had in his bargaining position due to the death of his brother. He, therefore, felt compelled to accept the agreement as written by Perrault because his alternatives were to proceed on the basis of the oral agreement or walk off, neither a satisfactory alternative. Under the agreement, petitioner and Perrault undertook six real estate projects. In 1965 the first of these projects was sold at a profit. Petitioner reported his share of the joint venture capital gain as gain from the sale of a capital asset. He has consistently reported gain from the sale of the projects in this manner. It is this manner of reporting the gain from the sale of three of the projects in the years 1968 and 1969 to which respondent objects. The projects sold in 1968 were the Camelot Inn, the Mansion House, and the University Club Tower. Perrault and Wheeler handled all of these projects similarly. In the case of the Camelot Inn, for example, it was petitioner who suggested *311 the site to be acquired and that a motel be erected. Perrault agreed that it would be a good project so the site was acquired using Perrault's funds. Petitioner's duties with respect to the projects included supervising construction, hiring subcontractors to do the specialty work, approving payrolls, making payments for materials, approving change orders, and approving interim payments to subcontractors. Additionally, in the cases of the Mansion House and the University Club Tower which were financed through an F.H.A. guarantee, it was petitioner who had sole responsibility for developing the final figures necessary to obtain the financing. Petitioner also performed a number of duties jointly with Perrault, such as selecting the architects for the projects and obtaining permanent financing for the Camelot Inn. Subcontracts were mutually agreed upon before signing, which either Perrault or Wheeler had the authority to do. Petitioner did not report any current operating revenues nor did he deduct any expenses with respect to the projects on his Federal income tax returns for the years in issue. Rather, during the period of years that the projects were operated under the Perrault-Wheeler *312 arrangement and before the properties were sold, Perrault reported all the current operating income and deducted all the expenses with respect to the projects. Upon sale of the properties, the profit reported by Perrault was the gain on the sale of the projects reduced by petitioner's 25 percent share, that is, petitioner's share was taken off the top. After completion of the projects, and a brief period of operation, the Camelot Inn, University Club Tower, and Mansion House were sold to the Kin-Ark Oil Company on May 23, 1968, in exchange for Kin-Ark Oil Company stock and debentures. Kin-Ark Oil Company was a small conglomerate whose stock was traded on the American Stock Exchange. Average trading volume for the stock was approximately 10,000 shares per month. The company had incurred losses in each of the three years preceding the year of sale. Petitioner's share of the sale proceeds was 32,029 shares of unregistered Kin-Ark Oil Company stock which was subject to an investmen letter restriction, unregistered Kin-Ark Oil Company convertible debentures, [2] and a note from the University Club of Tulsa in the face amount of $37,500. [3] As part of the agreement Kin-Ark Oil Company *313 was to use its best efforts to effect registration of the stock within approximately eight months after consummation of the sale. The stock was eventually registered sometime in early 1969. Petitioner reported the proceeds in 1968 as his share of joint venture capital gain, and not as compensation for services. Although the stock which he received traded on the American Stock Exchange at a mean price of $5.875 per share on the date of receipt, petitioner reported the stock as having a value of $2.15 per share on that date. Petitioner subsequently sold that same stock in April 1969 for approximately $7.39 per share. Similarly, while the face value of the debentures he received was $200,000, petitioner reported them as having a fair market value of $135,844 *314 on the date of their receipt. Petitioner sold the debentures in September 1969 for $151,784.50. Finally, the $37,500 note, which was petitioner's share of a debt owed the joint venture by the University Club of Tulsa, was reported for Federal income tax purposes as having a value of $25,000. The club settled the note in full for $33,750 in 1969. Thus, in tabular form, petitioner reported the 1968 and 1969 transactions as follows: Cost
Sale
(Value at
Capital
Price
5-23-68)
Gain
32,029 Kin-Ark common
$236,841.90
$ 68,741
$168,100.90
200M Kin-Ark debentures
151,784.50
135,844
15,940.50
Cash--Wheeler-Perrault
33,750.00
25,000
8,750.00
Venture [4]
[5] *315 Cash--from Perrault 25,163.00
25,163.00
Totals
$447,539.40
$229,585
$217,954.40
Reported long-term
capital gain
$108,977.20 Respondent, in the notice of deficiency, objected to not only the characterization and timing of the income reported by petitioner, but also to the values which petitioner assigned to each of the three instruments discussed above. Respondent asserted that the proceeds which petitioner received from the sale of the projects were not his share of joint venture capital gain, but rather were compensation for services. He further asserted that the investment letter restriction to which the stock received by petitioner was subject was such a severe restriction that no income was realized in the year of receipt, but rather in the year the restriction lapsed. As a result, he included the stock in *316 petitioner's income in 1969 at its full unrestricted value on the date of its receipt (May 23, 1968) in accordance with section 1.421-6(d)(2)(i), Income Tax Regs. As for the debentures, respondent maintained that the value was not $135,844 as reported by petitioner, but rather $150,000. Finally, respondent determined that the University Club note had a fair market value of $33,750 on the date it was received by petitioner. Thus, respondent treated the transactions as follows: Ordinary
Capital
Received
Income
Gain
In 1969
In 1968
In 1969
In 1969
32,029 Kin-Ark
$236,841.90 $
$188,170.38
$48,671.52
Common
200M Kin-Ark
151,784.50
150,000
1,784.50
debentures
University Club
33,750.00
33,750
note
Cash from Ainslie
25,163.00
25,163.00
Perrault
Totals
$447,539.40
$183,750
$213,333.38
$50,456.02
Recognized Capital Gain
$25,228.01 OPINION Briefly restated, petitioner entered into an agreement with Perrault to acquire and develop specific tracts of real property.Petitioner was to provide the "know-how" and Perrault the necessary finances. It was agreed that Perrault should recoup his investment plus a six percent interest factor, and that remaining profits, if any, were to be divided 75 percent to Perrault and 25 percent *317 to petitioner. The parties followed through with their agreement and, among others, constructed the Camelot Inn, the University Club Tower and the Mansion House, all located in Tulsa, Okla. These properties were sold in 1968 to Kin-Ark Oil Company in exchange for unregistered common stock and convertible debentures of Kin-Ark Oil Company plus unsecured notes of the University Club of Tulsa, a tenant in the University Club Tower. Petitioner had the stock, debentures and note which he received in 1968 appraised and reported this transaction for Federal income tax purposes as a long term capital gain based on the appraised values. In 1969, petitioner sold the stock and debentures and received payment on the University Club note. On the basis of these transactions he reported long term capital gain on his 1969 Federal income tax return. The salient issue which emerges from this set of facts is one of income characterization. This issue must necessarily be resolved by a determination of whether the agreement between petitioner and Perrault was one of joint venture or one of employment. Thus, we must determine the elements necessary to form a valid joint venture and whether those *318 elements existed in the case before us. Setting forth the particular elements of a joint venture is not as easy as might appear. A threshold issue we need determine is whether Federal or local law is determinative of the existence of a joint venture for Federal income tax purposes. In the instant case both parties assumed Oklahoma law alone was applicable in determining whether a joint venture had been formed. However, we do not agree. [6]
This and other courts have previously had to deal with the problem of whether Federal or local law is determinative of the existence of a joint venture for Federal income tax purposes. These decisions have not been consistent nor have they addressed other decisions apparently to the contrary. In each instance the court determined which body of law was to apply in deciding whether a joint venture arrangement existed without explanation as to why that particular body of law should apply. A "joint venture" is not specifically defined *319 by the Internal Revenue Code of 1954. The closest thing to a definition appears in both section 761(a) and section 7701(a)(2) where it is stated that "the term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization". [7] However, because a joint venture is an entity taxable as a partnership, cases dealing with the choice of law question with respect to partnerships are of probative value. [8] *320 The Supreme Court has thrice dealt with the Federal-state choice of law problem in relation to partnerships. Commissioner v. Culbertson,337 U.S. 733 (1949); Commissioner v. Tower,327 U.S. 280 (1946); Lusthaus v. Commissioner,327 U.S. 293 (1946). In each of the three cases the Court tested for the existence of a partnership using a Federal standard, ignoring the result at which an application of local law would have arrived. [9] *321 However, lower courts have differed as to whether the similarity of a joint venture to a partnership is sufficient to include a joint venture within the umbra cast by the trilogy of cases decided by the Supreme Court. There are a number of cases which hold Federal law determinative of the existence of a joint venture for Federal income tax purposes. Estate of Kahn v. Commissioner, 499 F. 2d 1186 (2d Cir. 1974), affg. a Memorandum Opinion of this Court; Arthur Venneri Co. v. United States, 340 F. 2d 337 (Ct. Cl. 1965); Haley v. Commissioner, 203 F. 2d 815 (5th Cir. 1953); First Mechanics Bank v. Commissioner, 91 F. 2d 275 (3d Cir. 1937); Herzberg v. United States, 176 F. Supp. 440 (S.D. Ind. 1959); Luna v. Commissioner, 42 T.C. 1067 (1964); Beck Chemical Equipment Corp. v. Commissioner, 27 T.C. 840 (1957). [10] There are, however, also cases which appear to apply a state law standard. Joe Balestrieri & Co. v. Commissioner, 177 F. 2d 867 (9th Cir. 1949); Fishback v. United States, 215 F. Supp. 621 (D. S.D. 1963); Frazell v. United States, 213 F. Supp. 457 (W.D. La. 1963), revd. and remanded on other grounds 335 F. 2d 487 (5th Cir. 1964), petition for rehearing *322 denied per curiam 339 F. 2d 885 (5th Cir. 1964), cert. denied 380 U.S. 961 (1965); Flanders v. United States, 172 F. Supp. 935 (N.D. Cal. 1959); Copeland v. Ratterree, an unreported case ( N.D. N.Y. 1957, 52 AFTR 1309, 57-2 USTC par. 9895); Tate v. Knox, 131 F. Supp. 514 (D. Minn. 1955). Finally, there are those cases which do not state whether a Federal or local law standard is being applied. S. & M. Plumbing Co. v. Commissioner, 55 T.C. 702 (1971); Podell v. Commissioner, 55 T.C. 429 (1970); Au v. Commissioner, 40 T.C. 264 (1963), affd. 330 F. 2d 1008 (9th Cir. 1964), cert. denied 379 U.S. 960 (1965). [11] See also Smith v. Commissioner, 8 T.C. 1319 (1947). Thus it can be seen that we have an issue, the resolution of which is anything but clear.
The fact that there is a Federal' standard for partnerships, we believe, provides a strong inference that the standard governing the existence of joint venture is likewise Federal. [12] As previously stated, sections 761(a) and 7701(a)(2) provide that "the term 'partnership' includes *323 a * * * joint venture." It seems patently unreasonable that the term "partnership" as used in the Code should be defined utilizing a Federal standard and that the term "joint venture," an entity subsumed within the term "partnership" for Federal income tax purposes, should be defined utilizing standards of local law. To do so would open the door for potential conflict because a joint venture as defined under local law might not bear the necessary indicia of partnership as that term is defined for Federal income tax purposes. Conversely, an entity, not technically a joint venture under local law, may well be an entity taxable as a partnership for Federal income tax purposes. [13]
Additionally, everything stated by the Supreme Court in the Tower, Lusthaus, and Culbertson cases is equally applicable to joint ventures. Beck Chemical Equipment Corp. v. Commissioner, supra. In those three cases the paramount concern of the Court was that *324 if classifications were left to determinations of state law, problems of form over substance would abound. As a result the Supreme Court found it necessary that the word "partnership" for purposes of Federal income taxation mean something other than the word "partnership" for purposes of state law. Federal tax statutes are designed to accomplish different purposes and goals than are state statutes. State courts are mindful of the purposes and goals of the state statutes when they classify an entity. [14] When an entity must be classified for purposes of a Federal income tax statute, policy considerations of Federal income tax law should govern that classification, not policy considerations of state law. [15] *325 *326 From the foregoing, the process of inductive reasoning should lead us to a rule of law stated generally as follows: Whether or not a joint venture exists for tax purposes is determined by applying the same tests used in determining the existence of a partnership.* * * Though it has been held that state law applies in determining whether there was a joint venture, the sounder view seems to be that state law is not determinative. * * * [6 Mertens, Law of Federal Income Taxation, sec. 35.05, p. 29.] *327 [Fn. refs. omitted.] Having decided that a Federal standard is appropriate, we must proceed to determine what that standard is. Again the trilogy of Supreme Court cases must first be examined to see if they offer any guidance. In the case of Commissioner v. Culbertson, supra, it is stated that the primary consideration in determining whether an entity taxable as a partnership exists is whether: the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.* * * [337 U.S. at 742] See also Luna v. Commissioner, supra. Thus the single most important consideration is the parties' intent to enter into a joint venture. And there are particular elements, none of which are conclusive, which are indicative of the existence or nonexistence of such intent. They are: The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to *328 share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.[Luna v. Commissioner, supra at pp. 1077-1078.] The agreement between the parties seems fairly clear in this case.It specifically stated: The parties hereto are associated in a joint venture, under the name of "Perrault and Wheeler", for the purpose of holding, developing, and managing real property for investment purposes. [16] *329 It was further stated: The venture shall relate to and include the projects described on Exhibits "A", "B", and "C" attached hereto and such other projects as Perrault and Wheeler shall mutually agree upon and designate from time to time * * * [Emphasis supplied.] The actual conduct of the parties supported the existence of a joint venture agreement between the parties. It was petitioner who exercised his authority on a day-to-day basis in selecting subcontractors, signing subcontracts, approving payrolls, approving interim payments to subcontractors, approving payments for materials, approving change orders in construction, and negotiating the F.H.A. commitments among other things. While *330 any one of these duties may not raise one to the status of a joint venturer, the total authority granted to petitioner was certainly consistent with such status.
Petitioner was to use his best efforts and so much of his time as was reasonably necessary for the successful completion of the projects; his efforts were to be particularly related to the acquisition, ownership, development and operation of real estate and improvements thereon. Perrault was to contribute cash, credit, or other financing for the purchase and development of the projects covered by the agreement. Little control was exercised over the petitioner's drawing account.He testified that his drawing account was very informal with no restriction as to amount. This seems supported in the record because at the point in time in 1969 when petitioner released his interest in the Villa Roma project he had a debit balance in his drawing account in the amount of $12,162.
Profits were to be allocated 75 percent to Perrault and 25 percent to petitioner. Cumulative losses were to be borne solely by Perrault; however, once operation of the venture resulted in a profit on a cumulative basis, losses on individual projects were to *331 be allocated in accordance with the ratios indicated above. Business was transacted under the name of "Perrault and Wheeler." The parties maintained an office in which they based their business operations. The stationery bore a "Perrault and Wheeler" letterhead. Advertising for the real estate projects also indicated a partnership type relationship between the parties. Additionally, we believe the manner in which Perrault reported the sales transaction for tax purposes is highly significant in seeking to determine intent. Perrault did not report 100 percent of the profit and then take a deduction for petitioner's share as compensation, even though it would have had significant tax advantages for him to have done so. This indicates to us that Perrault, who for tax purposes had an interest adverse to the existence of a joint venture, intended that a joint venture exist between himself and petitioner. Of course, petitioner likewise reported the transaction as if a joint venture existed between the parties. Separate books of account were maintained for the venture's operations. Perrault was given the authority to keep those books by means of which the net profits of the venture *332 were to be computed, subject however to Wheeler's right of examination at all reasonable times. Cf. Estate of Kahn v. Commissioner, supra.The books were required to be kept using a generally accepted method of accounting and petitioner could submit any dispute to Arthur Anderson & Co., certified public accountants, whose determination on the disputed matter would be conclusive on the parties. Respondent argued at trial that the fact Perrault reported all current operating income and current operating expenses from the operation of the projects was fatal to the finding of a joint venture because it indicated that petitioner did not truly share in the results of the venture's operations. However, this is not so. The agreement stated that petitioner was not to receive any distribution of profits until Perrault received, out of his share of operating income or sales proceeds (from the projects), an amount equal to his capital and advances plus six percent interest thereon. The agreement also provided that Perrault was to bear all losses in connection with each project until operation of the projects, on a cumulative basis, resulted in a profit. In the relatively brief period that *333 the joint venture actually operated each of the projects there was not a sufficient amount of operating income generated to entitle petitioner to begin receiving his share of the profits. As a result, Perrault's reporting of all income and expenses during this period comported perfectly with the agreement between the parties and was not adverse to the existence of a joint venture interest in petitioner. To be sure, there are factors in the agreement which tend to indicate the relationship between the parties was not that of a joint venture. Title to the properties was held solely in Perrault's name. [17] Cumulative losses of the venture were to be borne solely by Perrault. Petitioner could not borrow or lend money on behalf of the venture, execute a security instrument, release any debt or claim except upon payment in full, compromise or submit to arbitration any controversy involving the venture or to sell, assign, pledge, or mortgage his net profits interest in the venture. However, these restrictions on petitioner's authority were merely protection for Perrault's capital advances, and characteristics such as Perrault's holding title to the properties or bearing all the losses *334 have been specifically recognized by respondent as insufficient to negate the existence of a joint venture. Rev. Rul. 54-84, 1954-1 C.B. 284. Perrault was also restricted in his authority to deal with assets of the venture, and although he was not restricted as severly as petitioner, the restriction on Perrault was designed to accomplish the same purpose as those on the petitioner, that is to protect the other party's share of the joint venture income. [18] A relationship having salient characteristics similar to the one here *335 at issue has been recognized by respondent as a joint venture. In Rev. Rul. 54-84, supra, respondent held that the combination of service and capital partners, the absence of loss sharing, and title being held to venture property by one venturer (the one who made the capital contributions) was not fatal to the existence of a joint venture. Without specifically passing on the validity of the above ruling, we believe petitioner's contribution of his skill and know-how in developing commercial realty and Perrault's contribution of the capital necessary to get the projects under way were essential elements of the business enterprise. While not entirely free from doubt, we believe the totality of the relationship between the parties must be viewed as a joint venture. [19]
The remaining issues for our resolution concern problems of valuation. Both parties briefed these issues as if we would have to determine the timing and amount of compensation for services rendered *336 (i.e., they assumed a ruling adverse to petitioner on the classification issue). In order to increase the amount of compensation received by petitioner, respondent asserted in the notice of deficiency that the stock had no ascertainable fair market value upon receipt because of the investment letter restriction, but that fair market value could be determined only at such time as the restrictions lapsed. See section 1.421-6(d)(2)(i), Income Tax Regs. Petitioner contended that the property had an ascertainable fair market value on the date of receipt so as to have a lesser amount taxed as compensation at ordinary income rates, and a greater amount of subsequently realized capital gain. In light of our resolution of the first issue, that petitioner's share of the proceeds represented his distributable share of joint venture capital gain income, it is not clear that the positions of the parties would remain as they argued at trial and on brief because it now appears that we have an issue which is only one of timing. However, because the problem of valuation (including the question of whether the stock received had an ascertainable fair market value on the date of receipt, a question *337 which goes to the issue of timing) is factual in nature, we will utilize the contentions of the parties to aid us in arriving at the proper resolution of the timing and valuation issues. In the 1968 exchange, petitioner gave up his interest in three parcels of improved real property owned by the joint venture in exchange for 32,029 shares of unregistered stock of Kin-Ark Oil Company, unregistered convertible debentures of Kin-Ark Oil Company and a note of the University Club of Tulsa. The stock, as traded on the American Stock Exchange, had a mean price of $5.875 per share on May 23, 1968, the date the sale transaction took place. However, petitioner reported the stock on his return as having a value of $2.15 per share. Petitioner contends that this value is appropriate taking into account discount factors based on the investment letter restriction to which the stock received was subject, a blockage factor attributable to the large number of shares received, and the possibility that the stock would be delisted because Kin-Ark Oil Company had incurred losses in each of the three preceding years. The unregistered convertible debentures had a face value of $200,000 but were reported *338 by petitioner on his return as having a fair market value of $135,844 on the date of their receipt. Petitioner supports this discount based on the fact that the company was incurring losses and because the equity portion of the balance sheet was fairly modest when compared with the total capital structure of Kin-Ark Oil Company. However, respondent contends the appropriate value to have been $150,000. Finally, the University Club note had a face value of $37,500 but was reported by petitioner as having a value of $25,000 on the date it was received due to the "shakey financial condition of the club." Respondent contends the value of the note to have been $33,750.
The standard of fair market value is easily articulated, to wit: the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts. [Jack Daniel Distillery v. United States, 379 F. 2d 569 (Ct. Cl. 1967.)] Unfortunately, the application of that standard is not self-executing. Nonetheless, that standard must be applied and a value derived for each of the three items received *339 by petitioner in exchange for his interest in the joint venture property. The first item which must be valued is the restricted common stock of Kin-Ark Oil Company. In order to do so some of the cases which have valued restricted stock will be examined. There may be times when stock is so severely restricted that it does not have an ascertainable fair market value. Helvering v. Tex-Penn Oil Co.,300 U.S. 481 (1937); MacDonald v. Commissioner,230 F. 2d 534 (7th Cir. 1956), reversing 23 T.C. 227 (1954); Propper v. Commissioner, 89 F. 2d 617 (2d Cir. 1937); Kuchman v. Commissioner,18 T.C. 154 (1952). However, this is the exception rather than the rule. More often, although a restrictive sales agreement will have a depressing effect on value, it will not render the value of the stock indeterminable. Heiner v. Gwinner, 114 F. 2d 723 (3d Cir. 1940), cert. den. 311 U.S. 714 (1940); LeVant v. Commissioner, 376 F. 2d 434 (7th Cir. 1967); Victorson v. Commissioner, 326 F. 2d 264 (2d Cir. 1964); Husted v. Commissioner, 47 T.C. 664 (1967); Arc Realty Co. v. Commissioner, 34 T.C. 484 (1960); Kalech v. Commissioner, 23 T.C. 672 (1955). We think that in light of the circumstances here present, *340 such as the agreement by Kin-Ark Oil Company to utilize its best efforts to effect registration of the stock within approximately eight months after the transaction and the possibility of a private sale during the interim, that the Kin-Ark Oil Company stock was not "so severely restricted" that it did not have an ascertainable fair market value on May 23 1968, the date of its receipt by petitioner. Before proceeding, it should be noted that petitioner's subsequent sales of the instruments being valued may play a part in the valuation process. In the present case petitioner received Kin-Ark Oil Company stock, Kin-Ark Oil Company debentures, and the note from the University Club of Tulsa. Within the year following the year of receipt petitioner sold all three items. To the extent factors external to the character of the instruments themselves do not contribute to any dramatic increase, we believe the subsequent sales prices are probative evidence of fair market value on the date of receipt. Courts have utilized subsequent events in the bad debt area which requires a determination of worthlessness, Minneapolis, St. Paul Railroad Co. v. United States,164 Ct. Cl. 226 (1964); Portland Manufacturing Co. v. Commissioner,56 T.C. 58 (1971), *341 as well as in cases of valuation generally. Estate of Brown v. Commissioner,425 F. 2d 1406 (5th Cir. 1970); Arc Realty Co. v. Commissioner,supra[20]Couzens v. Commissioner, 11 B.T.A. 1040, 1165 (1928). However, care must be used in utilizing such sales as evidence of value and proper regard must be given to factors arising in the interim between the date of valuation and the date of sale. Clearly, the proximity of such sale to the valuation date will greatly influence the weight to be accorded such sale in the valuation process. Because of the proximity of the subsequent sales to the date of receipt by petitioner, and the absence of any evidence showing outside factors which would explain marked fluctuations in value between the date of receipt by petitioner and the date of sale, we do find the later sales prices highly probative evidence of the correct value of the instruments received by petitioner on May 23, 1968. At a minimum, these later sales indicate what the buyer and seller might reasonably have expected the value of the instruments to be on the valuation date. Now we must proceed to value *342 each specific instrument on that date. It may be possible that a letter agreement restriction could in some instances cause a discount from market value by as much as 60 percent, the amount contended by petitioner. However, the situation here was not one where petitioner's stock was subject to an investment letter restriction and petitioner had no rights of his own apart from those restrictions; rather, he had an agreement with Kin-Ark Oil Company that it was to use its best efforts to effect registration within approximately eight months after the date of the sale. In light of this ancillary agreement with Kin-Ark Oil Company and considering the later sales prices received by petitioner for the Kin-Ark Oil Company stock, we hold that a 60 percent discount factor is excessive. However, we do feel that some discount due to the investment letter restriction is appropriate, and estimating as best we can from the evidence presented, we hold the appropriate discount to be 10 percent. Petitioner also maintains that a discount was appropriate in recognition of the blockage factor.An excellent discussion of blockage is contained in the case of Bankers Trust Co. v. United States,518 F. 2d 1210, 1221-1222 (Ct. Cl. 1975), *343 cert. den. 424 U.S. 966 (1976), where it is stated: While a large block of shares dumped on the market at one moment will ordinarily depress the market price for a time, Seas Shipping Co. v. Comm'r,supra 371 F. 2d at 530, the courts which have considered the blockage issue have concluded that the problem should be treated in terms of whether the market could have absorbed the shares within a reasonable period of time. Richardson v. Comm'r,151 F. 2d 102 (C.A. 2, 1945), cert.denied326 U.S. 796, 66 S.Ct. 490, 90 L.Ed. 485 (1946); White Farm Equipment Co.,supra, 61 T.C. at 215. In those cases in which either a blockage discount has been allowed or the market price disregarded entirely because too large a block was involved, the number of shares being valued was very much greater than the total shares traded in a year. See,e.g.,Amerada Hess Corp.,supra, 517 F. 2d at 89, 91 (665,000 shares being valued; 444,000 traded during entire year); Moore-McCormack Lines, Inc.,supra, 44 T.C. at 760 (300,000 shares being valued; 166,000 traded during entire year). * * * In the case before us petitioner received 32,029 shares of Kin-Ark Oil Company stock. Testimony by petitioner's witness *344 at trial indicated that the average trading volume for the Kin-Ark Oil Company shares during the first five months of 1968 was in excess of 10,000 shares per month. Clearly, the 32,029 stares received by petitioner were far below the total number of shares traded in a year. We think that the market would absorb petitioner's shares within a reasonable period of time. As a result, a blockage discount is inappropriate. Nor should any discount be allowed merely because of the possibility the stock could be delisted as of December 31, 1969. We believe the investing public would be aware this possibility existed and the market price would accordingly reflect the depressing effect which this possibility had on the stock's value. Therefore, based on all the evidence in the present case, we find the value of the Kin-Ark Oil Company stock to have been $169,353 at the time it was received by petitioner in 1968. Turning now to the debentures, petitioner reported them as having a value of $135,844 on the date of their receipt. Testimony from petitioner's expert witness indicated that this discount from the $200,000 face value was in recognition of the high risk nature of the security. *345 This risk was attributable to the following factors; the company was incurring losses, the equity portion of the balance sheet was fairly modest when compared with its total capital structure, and the securities were not readily marketable. A high rate of return (13 percent) was utilized by petitioner's appraiser to reflect the necessity that these debentures had to yield an attractive investment return in order to offset the risks associated with those securities. [21] *346 However, while we are convinced that a substantial discount from face value is appropriate, the burden of proof to establish a value lower than that asserted by the Commissioner is on the taxpayer. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Although the petitioner herein has certainly established that a discount from face is appropriate, it was incumbent upon him to lay a foundation from which this Court could sufficiently quantify the fair market value of the debentures to show that they had a value lower than the $150,000 value asserted by the Commissioner.We feel he has not done this, and accordingly we find the Commissioner's value of $150,000 is correct. The same must be said with respect to the note of the University Club of Tulsa which had a face value of $37,500, but was reported by petitioner as having a value of $25,000 on the date of its receipt. Petitioner testified that the $12,500 discount reflected the "very shakey" financial condition of the club due to undercapitalization, the fact that enthusiasm for the club had waned due to a delay in construction, and the fact that the club had overextended its financial resources in spending too much money for interior finishing. Once again, while these factors would all tend to indicate the note had a value less than face, petitioner has failed to demonstrate that a value lower than the $33,750 value asserted by the Commissioner is appropriate. Welch v. Helvering,supra; Rule 142(a), Tax Court Rules of Practice and Procedure. Accordingly, we hold the fair market value of the note on *347 May 23, 1968, to have been $33,750. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. The conversion price of the debentures was $5.60 per share. ↩
3. While the parties here have stipulated that the note was part of the sales proceeds, there is evidence in the record that the note was owned by the Perrault-Wheeler business entity prior to the sale and that it was not actually part of the sales proceeds. However, because the parties have stipulated that the note was part of the sales proceeds, we find accordingly.↩
4. This represents a note frm the University Club of Tulsa. Although petitioner treats the proceeds from this portion of the transaction as the proceeds of a sale or exchange, it was actually proceeds from the satisfaction of indebtedness. However, because of our holding as to the value of the note on the date it was received by petitioner, it will not be necessary for us to raise an issue as to the characterization of the proceeds of the note. ↩
5. Although not clear from the record, this figure apparently represents a payment by Perrault to petitioner for petitioner's relinquishment of his interest in a fourth project of the venture (Villa Roma). This apparently occurred in 1969 and payment received by petitioner was in the form of a credit against his prior advances and cash. A discrepancy appears in the record as to the precise amount of this final settlement, but, if necessary, this can be resolved by the parties in the Rule 155 computation.
6. We cannot reconcile respondent's position here with his position in Rev. Rul. 54-84, 1954-1 C.B. 284↩, finding a particular business entity a joint venture without knowing the statuts of the entity under local law.
7. See J. Sullivan, "Conflicts Between State Partnership Laws and the Internal Revenue Code," 15 Tax L. Rev. 105, 113↩ (1959), where the generally broader classification of the term partnership in the Internal Revenue Code is specifically noted. See also section 301.7701-3(a), Proced. & Admin. Regs. 8. Id. at 230-231, where it is stated: Joint ventures, the last of the specifically enumerated classes considered as partnerships, are generally considered to be partnerships and subject to the same rules as partnerships. Some efforts are made to distinguish them from partnerships on the ground that they are intended to carry out a specific transaction or a single enterprise rather than carry on a continuing business. Nither such distinctions nor limited applicability of partnership law to some aspects of joint venture operations or the actions of the members of joint ventures justify different treatment for tax purposes. [Fn. ref. omitted.] See also 6 Mertens, Law of Federal Income Taxation sec. 35.05, p. 29, which states: Whether or not a joint venture exists for tax purposes is determined by applying the same tests used in determining the existence of a partnership. * * *↩
9. See Earp v. Jones,131 F. 2d 292 (10th Cir. 1942), where an entity recognized as a partnership under Oklahoma law was held not to be a partnership for Federal income tax purposes. See also Kelly v. Commissioner,T.C. Memo. 1970-250, where the Tax Court stated, "there may be a partnership for Federal income tax purposes even though there is no partnership as a matter of State law."
10. Baughn v. Commissioner, T.C. Memo. 1969-282; Badger Co. v. Commissioner,T.C. Memo. 1967-178↩. 11. Melbourne Ranches, Inc. v. Commissioner, T.C.↩ Memo. 1971-264.
12. Indeed, section 301.7701-1(c), Proced. & Admin. Regs., states: the classes into which organizations are to be placed for purposes of taxation are determined under the Internal Revenue Code. * * * ↩
13. See Kelly v. Commissioner, cited at footnote 9, supra↩.
14. In Estate of Kahn v. Commissioner, supra↩, a state court in a previous case involving the taxpayer wanted to find a partnership so the taxpayer's associate could maintain an action for an accounting under state law. This Court and the Court of Appeals found no partnership so Kahn (the taxpayer) would be taxed on all the funds with which he absconded. 15. While the parties here agree that the issue is whether a joint venture was formed between petitioner and Perrault, and apparently most courts would approach the problem in this manner, it may well be that the best approach to the issue before us lies not in determining whether a joint venture has been formed, but rather whether an entity taxable as a partnership has been formed. In the statute it seems as though the terms "syndicate," "group," "pool," and "joint venture" are merely illustrative of the concept of an entity taxable as a partnership under Federal tax law and the "catch-all" phrase "or other unincorporated organization" is intended to bring within the meaning of the term partnership entities of a kind like those specifically enumerated. Thus, the key determination using this approach would not be whether a joint venture or any other of the enumerated entities had been formed, but rather whether an entity is of the same generic class as those entities and is, therefore, taxable as a partnership. This approach was used in Bartholomew v. Commissioner, 186 F. 2d 315 (8th Cir. 1951), and apparently in Estate of Kahn v. Commissioner,supra.For instance this Court in Kahn dealt specifically with the issue of whether a joint venture had been formed which would then be taxable as a partnership. See Grober v. Commissioner,T.C. Memo. 1972-240. We applied a Federal standard to find no joint venture had been formed. However, the Second Circuit, in affirming our decision, seemingly ignored the intermediate step of determining whether a joint venture had been formed and went directly to the question of whether an entity taxable as a partnership had been formed. Clearly this latter approach would entail the use of a Federal standard because the Supreme Court has stated that the ultimate determination of whether an entity is taxable as a partnership is to be governed by a Federal standard. Commissioner v. Culbertson,supra;Commissioner v. Tower, supra; Lusthaus v. Commissioner, supra.
See also J. Sullivan cited at footnote 8, supra.↩
16. Paragraph 10 of the agreement between Perrault and petitioner stated: The parties stipulate and agree that no partnership has been or is hereby created or intended between them. The parties shall be joint venturers only and only with respect to the projects herein designated and upon the limited basis herein set forth. Pursuant to Section 761(a) of the Internal Revenue Code of 1954↩, Perrault and Wheeler hereby elect to exclude this venture from the application of all or any part of the Subchapter K, Subtitle A, Chapter I of the Internal Revenue Code of 1954, to the full extent permitted by regulations issued by the Secretary of the Treasury or his delegate.Perrault may cause to be filed with the Internal Revenue Service an appropriate election on behalf of himself and Wheeler to be so excluded.
17. Although title to the property was held in Perrault's name, there are indications in the record that the parties intended petitioner's interest in the properties to be one of ownership. For instance, in documents filed with the Federal Housing Administration Perrault listed petitioner as a co-owner of the Mansion House and University Club Tower. ↩
18. Paragraph 5(d)(ii) of the agreement between Perrault and petitioner stated: "Perrault shall not, however, withdraw or utilize funds of the venture for any purpose unrelated to the venture unless the venture has retained, after such withdrawals, sufficient cash or liquid assets to equal Wheeler's share of the profits."↩
19. Because of our resolution of this issue in favor of petitioners, we need not decide the income averaging issue which petitioners only sought to raise if the income received was determined to be compensation for services rendered.↩
20. Mills v. Commissioner,↩ a Memorandum Opinion of this Court dated Aug. 19, 1946.
21. In valuing the debentures, petitioner assumed the stock had a fair market value of $2.15 per share and that the convertible feature was of no value. However, in light of the value which we have determined the stock to have had, the convertible feature does have significance in valuing the debentures.