William D. FRAZELL and
Martha T. Frazell

v.

The UNITED STATES of America.
Civ. A. No. 8031.

United States District Court
W. D. Louisiana,
Shreveport Division.

June 22, 1967.

W. Scott Wilkinson, Wilkinson, Woods, Carmody, Meadows & Hall, Shreveport, La., for plaintiffs.

Richard Rogovin, Asst. Atty. Gen., Hubert M. Doster, Robert L. Waters, Peter Winstead, Attorneys, Tax Division, Department of Justice, Washington, D. C., Edward L. Shaheen, U. S. Atty., Shreveport, La., for the Government.

OPINION ON MERITS
AFTER REMAND

BEN C. DAWKINS, Jr., Chief Judge.

On remand from the Court of Appeals, we are to make only two factual determinations in this case. The facts concerning the transactions at issue are largely undisputed and are discussed at length in our original opinion on the merits.[1] For the purposes of our de-

1. Frazell v. United States, 213 F.Supp. 457 (W.D.La.1963).

See also United States v. Frazell, 335 F.2d 487 (5 Cir. 1964), reh. denied, 339 F.2d 885, cert. denied, 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152.

terminations on remand, however, we deem it necessary briefly to summarize those facts.

In early 1949, the Abilene, Texas area was experiencing a colossal boom in oil and gas production. William D. Frazell, a geologist, was actively practicing his profession in that area—compiling geologic data, gathering and completing geologic maps and securing leases for his employers. After two years of both intensive and extensive experience in the area, Frazell entered into a contract[2] with the N. H. Wheless Oil Company and W. C. Woolf under which he was to recommend their procuring certain properties which he deemed capable of potential oil and gas production. As his remuneration, Frazell was to receive "a monthly salary or drawing account" plus expenses and specified interests in the acquired property. It was agreed, however, that Frazell's interests in the property were not to be realized until Wheless and Woolf recovered all of their expenses, including those amounts advanced to Frazell during the existence of the joint venture.

To say that the arrangement proved successful is an understatement. Of thirty-six wells drilled during the venture, twenty-nine were producers. When it became evident that Wheless and Woolf would soon recover their expenses, the parties decided to incorporate and transfer the previously acquired properties to the corporation in return for the issuance of debentures to Wheless and Woolf and stock to Wheless, Woolf and Frazell. As his interest, Frazell received thirteen per cent of the issued stock, having a fair market value of $91,000.00. Believing that he received this stock in a tax-free

exchange under section 351(a), Internal Revenue Code of 1954,[3] he included no part of the stock's value in his 1955 income tax return. The Commissioner ruled that the entire $91,000.00 should have been included as income and assessed a deficiency. Frazell and his spouse paid under protest $64,169.80 as additional federal income taxes with interest and then sought recovery.

In our original opinion, we concluded that under Louisiana law the agreement between Wheless, Woolf and Frazell constituted a joint venture rather than an employment contract. Since Frazell had an interest in the properties subject to the joint venture agreement, it was our conclusion that an exchange of stock for that interest was a tax-free exchange of "property" for stock within the meaning of section 351(a).[4] The Court of Appeals, however, ruled that categorization of the agreement as a joint venture under Louisiana law did not bring the exchange within section 351(a). Thus the Court held that Frazell's interest in the corporation was primarily in return for his services as a geologist and taxable as income. Finding that Frazell had allegedly contributed to the joint venture certain valuable maps and geologic data, which would constitute "property" within section 351(a), the case was remanded for resolution of these two factual determinations:

"(1) Did Frazell contribute the maps in question to the oil venture or did he keep them as his own personal property? (2) If he contributed them to the venture, what was their value at the time they were contributed?"[5]

Since the Government concedes that the maps were contributed to the joint ven-

---

2. The entire agreement is set forth as an appendix to our original opinion, 213 F. Supp. 457, 468.

3. Section 351(a), Internal Revenue Code of 1954, provides:
   "No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the

exchange such person or persons are in control * * * of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property."

4. Frazell v. United States, 213 F.Supp. 457, 468 (W.D.La.1963).

5. United States v. Frazell, 335 F.2d 487, 491 (5 Cir. 1964).

ture by Frazell, the only issue remaining for our determination is the value of the maps at the time of contribution. In attempting to prove the value of the maps, Frazell offers the use of two distinctively different valuation methods.

■ By the first method, Frazell contends that the maps' true value can be ascertained only by valuing each of the forty-one saleable geologic ideas or prospects on the maps. By the use of statistical averages and the remuneration customarily received by an independent geologist in the sale of a prospect, Frazell values the maps, after discount, at $367,-000.00. Using basically the same method, Dr. Frank B. Conselman, an eminent geologist who has practiced in the Abilene area since 1947, values the maps at $328,-000.00. However, since we conclude that this type of valuation is improper because of its highly speculative nature, we must reject those figures.

■ The reasons we view this method as speculative are virtually self-evident. Here we are to determine the value of the maps *at the time of contribution*, and the prospects upon which Frazell and Dr. Conselman based their valuations actually consist of forty-one red circles drawn on the maps after remand of this case. Although we do not doubt Frazell's veracity regarding his interest in these properties in 1951, we simply cannot judicially ascertain the value of the maps in light of ultimate production from within certain areas which were not delineated at the time of the contribution of those maps.

The alternative method of valuation, which neither Frazell nor Dr. Conselman considers to reflect the true value of the maps, consists of tabulating the cost of reconstruction of the maps. The basis for this type of valuation is that since Frazell contributed the maps to the joint venture, their value to the venture is reflected by what it would have cost to construct the maps. Without doubt, evaluating in this manner reduces the element of speculation and results in a more conservative estimate of value. However,

while Frazell contends that the cost of construction in 1951 would have been $61,375.00, the Government's expert witnesses assess the cost at various points between $975.00 and $2,050.00. In view of this wide disparity, examination of the bases upon which the witnesses grounded their opinions is necessary.

According to Frazell, it would require in excess of 491 days for a geologist in the Abilene area to duplicate the maps in 1951, considering the availability of information and the sources of that information during the boom period. Dr. Conselman, Frazell's expert witness, was unable to definitely fix a specific number of days, but he was of the opinion that Frazell's estimation was within reasonable limits. As to Frazell using $125.00 per day as basic remuneration due a geologist in the Abilene area during the years 1949–1951, Dr. Conselman testified that such a rate was normal and justified. The Government does not contend otherwise.

Both active, experienced geologists, the Government's expert witnesses were Howard E. Rothrock and Philip Bohart. Except for a period between 1922 and 1926, Mr. Rothrock did not actively practice his profession in the Abilene area until 1952, admittedly after the area had reached its peak in oil production. In testifying that he could reproduce the maps at issue for $1,-506.00, Mr. Rothrock said that electric logs, drillers' logs and elevations could be purchased at nominal prices. With this information, and surface and aerial maps also acquired at nominal prices, he would employ landmen to put the lease information on the maps and draftsmen to complete the drafting at $2.00 per hour. When asked on cross-examination what experience he had in the Abilene area during the oil boom, Mr. Rothrock replied:

"In every boom period labor is scarce, of course. What the situation was in 1950 in Runnels and Coleman County, I have no way of knowing. In 1952 when I came there, I came with

a landman. I don't know what it was in 1950." [6]

Philip Bohart, an independent consulting geologist, now practicing in Midland, Texas admittedly worked up only one prospect in the Abilene area. This prospect was completed in 1958, approximately six years after the peak period in oil production. Prefacing his testimony with the statement that he was evaluating the maps in terms of an active area where information was lacking or difficult to obtain, Mr. Bohart nonetheless included in his cost analysis the purchases of logs, services of landmen and draftsmen and the possibility of his secretary tracing some of the material on the maps for him. Mr. Bohart eventually arrived at three different estimates—the first estimate was based on cost of materials and his time at $125.00 per day and totalled $2,-050.00. His second estimate was based, on the same cost of materials but with a reduced charge of $75.00 per day. In his third estimate, he assumed that he could borrow or swap a third of the materials needed to construct the maps, allowing a further reduction in cost of construction. In all of his estimates, Mr. Bohart, like Mr. Rothrock, included the use of log services, elevation services, landmen and draftsmen.

By way of rebuttal testimony, Frazell testified that trustworthy landmen were unavailable in the area in 1951. He also said that he did all of his own drafting at that time because of the unavailability of draftsmen, and since his drafting was often completed at various times and places, it would have been both inconvenient and impractical to employ a draftsman. Although Mr. Rothrock and Mr. Bohart were of the opinion that some of the maps at issue could be purchased from the County at nominal prices, Frazell testified that the County maps available in 1949 and 1950 were highly inaccurate because they had been developed prior to extensive oil activity in the area. In order to get accurate information at that time, Frazell said that it was necessary for the geologist to do a great deal of legwork checking on available public information and modifying it in light of later oil development.

Athough Frazell admitted the existence of the Abilene Elevation Service in 1949 and 1950, he testified that the service ran elevations only every two or three weeks and, frequently, wells were completed before the service was able to obtain the information. Because of this situation, it was necessary for the geologist to seek out the operators and toolpushers to get current, accurate information concerning the elevations in the area.

Frazell also testified that micrologs, a valuable geologist's tool, were unavailable in the Abilene area prior to February 9, 1951, the date of his original agreement with Wheless and Woolf. As to Rothrock's testimony concerning the purchase of electric logs at nominal prices, Frazell was of the opinion that Rothrock was speaking of a later period in the development of the area. Electric logs, he asserted, were quite difficult to obtain and certainly could not be purchased during this particular period of active play.

In trying to determine the value of the maps at issue, we are disadvantaged by the absence of an existing judicial standard. Insofar as our research indicates, we have found no case in which geologic maps have been the subject of an evaluation. Initially, of course, we rejected the use of the prospect method as proffered by Frazell and Dr. Conselman as being highly speculative. Perhaps, as Dr. Conselman indicates, this is really the proper method to use in reaching the actual value of the maps since it reflects what a geologist with a certain number of prospects might realize as remuneration. While we believe that this test could prove to be useful in some cases, there is little doubt of its inherent speculativeness here.

By examination of the views of the expert witnesses, it is also clear that the reconstruction method is subject to at least some speculation. On the one hand,

6. Transcript, p. 183.

the Government's witnesses view construction of the maps as a very simple matter. Of course, with the availability of landmen, draftsmen, log services and elevation services, such may be the case. But from the testimony of Frazell and Dr. Conselman, who were both active in the Abilene area during the boom period, we conclude that if such services were available prior to February 9, 1951, they were either generally inaccurate or unavailable to the great majority of geologists practicing in the Abilene area. Thus it seems quite clear that the figures reached by the Government's witnesses are far below the actual cost of construction of the maps. We do feel, however, that the estimate of Frazell exceeds the true value of the maps.

Although the Government also contends that the value of the maps cannot amount to much since maps are merely the tools of a geologist and an operator is primarily interested in the abilities of the geologist, we reject this contention as inapposite to the facts of the case. In this regard, the testimony of N. H. Wheless is particularly cogent. While Wheless was interested in retaining the services of a competent geologist, he was just as interested in the immediate acquisition of geologic data and maps which could be accumulated without expending considerable time and expense. Perhaps the best evidence conveying the importance of the maps to the venture is the following testimony of Mr. Wheless:

"WILKINSON: What we are interested in is whether or not Mr. Frazell contributed any geological maps or data to the 1951 venture?

WHELESS: Yes, he had maps that he had assembled and worked on and worked up in that territory for at least two years before the Woolf and Wheless joint venture with which he came to us.

WILKINSON: Did you consider that those maps had any value to your venture?

WHELESS: Yes, sir. We spent quite a good deal of money backing up that opinion.

WILKINSON: Would you have entered into this area with Mr. Frazell if he did not have the maps or geological data?

WHELESS: No, we wouldn't have without the background, and so forth, of Mr. Frazell. *I doubt very seriously if we would have made an arrangement like that, sending him into that territory, except for the knowledge he assembled which appeared largely on those maps.* [Emphasis supplied.]

WILKINSON: Were those maps actually used for the purpose of acquiring mineral leases and drilling of wells during the course of your joint venture?

WHELESS: Yes, sir, they were used very largely. I don't know that I can say how much money we spent in developing the information and developing the prospects Mr. Frazell brought into the proposition, but it was in excess of a million dollars that we spent in the course of those operations." [7]

From this testimony, it is clear that Wheless and Woolf were not merely interested in hiring a geologist. The maps were extremely valuable to the venture and, without the maps, the venture probably would have never been formed. To contend that the maps were practically valueless is incredible in light of this testimony. It should also be noted that the highest valuation of the Government's witnesses was $2,050.00. If the maps could be compiled in no more than ten and a half days, as the Government contends, why would two prudent operators be willing to assign thirteen per cent of their net profits in return for the services of an experienced geologist equipped with the maps and geologic data? If the data could have been compiled in ten and a half days, why does Mr. Wheless say that "[Frazell] had accumulated maps,

---

7. Transcript, p. 6.

geological data and various information that was valuable to the arrangement that it would have taken a long time for someone else just moving into the territory to accumulate"?

It is our conclusion that the maps and geologic data were extremely valuable to the venture and would have been valuable to any one entering into such an agreement with Frazell. In assessing value, however, we do not base our valuation upon reconstruction costs alone. As noted previously, Frazell estimated that it would cost $61,375.00 to reconstruct the maps. Although Dr. Conselman thought this estimate to be within reasonable limits, we must at the same time remain cognizant of the fact that prudent operators would not have been able to expend such a large amount upon the construction of the maps during 1951 in the Abilene area. After considering all of the evidence introduced as to their value, and believing that Frazell was primarily compensated for his services as a geologist, we conclude that Frazell has conclusively established that the maps were worth not less than $25.000.00 as of February 9, 1951.

A proper decree should be presented.