BOZIDAR and JOAN M. RAZNATOVICH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Raznatovich v. Commissioner
Docket No. 1367-79.
United States Tax Court
T.C. Memo 1980-436; 1980 Tax Ct. Memo LEXIS 148; 41 T.C.M. (CCH) 79; T.C.M. (RIA) 80436; September 29, 1980, Filed Michael D. Brayton, for the petitioners. Robert W. Towler, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax in the amounts of $4,384 and $759 for the calendar years 1974 and 1976, respectively. Some of the issued raised by the pleadings have been disposed of by the parties leaving for our decision only the fair market value of certain film negatives on June 11, 1974, when they were donated by Bozidar Raznatovich to the Historical Museum of the City of San Jose (Historical Museum). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, who *150 resided in Santa Clara, California, at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1974 and 1976 with the Internal Revenue Center in Fresno, California.
Bozidar Raznatovich (petitioner) is an electrical engineer licensed in California, Arizona, and Oregon. Prior to 1969 he had worked in a number of capacities as an engineer. In 1969 he went into a business as a sole proprietor as a photogrammetric engineer. In this business petitioner has aerial photographs taken of certain areas and from these aerial photographs develops maps for such customers as developers, city planners, and geologists. As of the date of the trial of this case, petitioner's photogrammetric firm was one of the largest in the western United States. Prior to 1969 firms by which petitioner was employed had engaged a Mr. Art Jacobs, who was engaged in an aerial photography business under the name of Jacobson Company, to take photographs for their use. Generally, these photographs would be taken from a plane flying at 1,200 to 3,000 feet and occasionally up to 6,000 feet. Most of the clients for whom Mr. Jacobs took aerial photographs would *151 leave the negatives with Mr. Jacobs. In 1969 when petitioner started his company, Mr. Jacobs came to see him and asked him if he would like to buy his library of negatives. At that time Mr. Jacobs had the library of negatives indexed. However, because of a shortage of funds, petitioner did not buy the library. In 1970 Mr. Jacobs died. In 1972 petitioner learned that the photographs and negatives Mr. Jacobs had offered to sell him in 1969 had not been sold but were in the possession of Mr. Jacobs' daughter. Petitioner called Mr. Jacobs' daughter and asked her if she would like to sell the negatives and photographs. She said she would. Petitioner asked her the price at which she would sell these items. Mr. Jacobs' daughter offered to sell the negatives, which consisted of 18 canisters containing approximately 5,000 developed black and white 9 inch X 9 inch film negatives on reels, 16 small boxes of 9 inch X 9 inch black and white aerial photographic prints, 2 boxes of glass plates with aerial overlays, 2 lenses, an obsolete dryer, and an assortment of odds and ends pertaining to photography, for $300. On October 17, 1972, petitioner purchased these items from Mr. Jacobs' daughter *152 for $300. At that time petitioner thought that the negatives might be potentially useful in his business. However, at the time petitioner purchased the negatives and other items, the index to the negatives had been destroyed. Without an index the negatives were worthless to petitioner. Petitioner determined that it would take a knowledgeable person 5 to 6 months of full-time work to index the negatives so as to have them in useful condition. Petitioner decided to donate the negatives to the Historical Museum since he was of the opinion that the museum could provide the manpower to have the negatives properly indexed so that they would be available for use by historians or other persons interested in the development of Santa Clara County and other areas of California. The negatives covered the period from 1962 through 1969 and areas extending from San Diego almost as far north as San Francisco. On June 11, 1974, petitioner donated the 18 canisters containing approximately 5,000 developed black and white negatives, the 16 small boxes of black and white aerial photographic prints, and the 2 boxes of glass plates with aerial overlays to the Historical Museum. These items were *153 not used in petitioner's business or otherwise held for the production of income by petitioner. The items have been retained by the Historical Museum but at the date of trial had not been indexed. They were still retained by the Historical Museum in their uncataloged collection. The Historical Museum regarded the negatives donated by petitioner as an integral and important part of the museum's collection. At the time of the trial, the museum was seeking to obtain a government grant which could be used to index the negatives so that they would be available for use by persons studying the development of the area of California which they covered. With funds available to index the negatives, the museum, instead of merely warehousing them, would be able to have them available for use or for making of prints. The United States Geological Survey (Geological Survey) and the U.S. Department of Agriculture have aerially photographed most of the areas covered by the photographs in the collection petitioner donated to the Historical Museum. A copy of a negative or a print of an aerial photograph made by the Geological Survey is available to be purchased by any interested individual. The *154 aerial photographs of the Geological Survey are indexed. The aerial photographs taken by the Geological Survey were from an altitude of approximately 15,000 feet. For this reason an enlargement of an aerial photograph taken by the Geological Survey will not show as great detail as one made from the donated negatives. However, the photographs taken by the Geological Survey can be enlarged so that an ordinary city block will show up as about 1/2 inch X 1 inch. With the use of a stereoscope, a viewer of the photographs made by the Geological Survey can determine contour, slope, and drainage. Petitioners on their Federal income tax return for the calendar year 1974 claimed a deduction of $15,000 for contribution to the Historical Museum explaining the claimed deduction as follows: Statement in Support of Contribution to the Historical Museum of the City of San Jose: Contribution
Items Contributed
Amount
(1) 18 Canisters (or approximately 5000 exposures)
of developed film from years 1968 forward--
cost: $3.00 each including material, flying,
developing and fixer costs
$ 15,000
(2) 16 small boxes of 9 inch X 9 inch aerial photographs,
B & W -- cost: approximately $2.50 each
0
(3) 2 boxes of glass plates with aerial overlay
0
Total
$ 15,000
*155 Respondent in his notice of deficiency disallowed petitioners' claimed deduction for the $15,000 contribution to the Historical Museum with the explanation that evidence had not been provided to support the claimed deduction in the amount of $15,000. Petitioners in their petition claimed an overpayment of tax on the basis of the value of the items donated to the Historical Museum on June 11, 1974, being $32,500. OPINION Section 170(a)(1), I.R.C. 1954, [1] provides for the allowance of a deduction for charitable contributions as defined in section 170(c). Section 170(c) provides that the term "charitable contribution" means "a contribution or gift to or for the use of--(1) A State * * * or any political subdivision * * *" thereof. Here clearly the Historical Museum was a part of an operation of the City of San Jose and respondent does not contend that the contribution of the negatives by petitioner is not deductible to the extent of the fair market value of the negatives contributed. [2]
*156 Section 1.170A-1(c), Income Tax Regs., as applicable to the year here in issue provides that when a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the date contributed reduced when necessary as provided in section 170(e)(1). [3] Our problem here, therefore, is to determine the fair market value of the property donated. Petitioner does not contend that the 16 boxes of 9 inch X 9 inch black and white aerial photographic prints or the 2 boxes of glass plates had any fair market value on June 11, 1974, when they were donated to the Historical Museum. The issue is only the fair market value of the 5,000 black and white negatives. *157 Petitioner's expert witness testified that in valuing the negatives he ruled out the market value and income approach. The method he used to determine his opinion as to the value of the negatives was a reproduction cost based on what he referred to as "mobilization" costs. These costs as determined by petitioner consisted of the cost of the airplane flights, the film, the photographer's time, and related items based on prices in 1978. The computation made by petitioner's expert resulted in a total cost of 5,000 exposures of $97,000.Petitioner's expert then stated that: Studying the $100,000.00 figure that we were approaching, we concluded that it was sort of unrealistic, and we discounted it by two-thirds, figuring that one-third actually represented the very basic cost of material and the use of the equipment. In this way petitioner's expert came up with a value of the negatives of $32,500. Petitioners argue that the films are unique and that the best method of valuation is reproduction costs. They rely on Cupler II v. Commissioner,64 T.C. 946 (1975); Frazell v. United States,269 F. Supp. 885 (W.D. La. 1967); Clinton Cotton Mills v. Commissioner,78 F.2d 292 (4th Cir. 1935), *158 reversing and remanding 28 B.T.A. 1312 (1933). Cupler II v. Commissioner,supra, in substance holds that all facts must be considered in reaching a determination of fair market value. In this case we stated (at 955): The value of a charitable contribution is a question of fact. Maurice Jarre,64 T.C. 183 (1975). The legal standard defining fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." See William H. Mauldin, 60 T.C. at 758; sec. 1.170-1(c)(1), Income Tax Regs. That standard is singularly unhelpful here. Indeed, the parties themselves recognized this in that they produced no evidence of "fair market value" as articulated by the foregoing definition. Nevertheless, we recognize that "absence of market price is no barrier to valuation." See Guggenheim v. Rasquin,312 U.S. 254, 258 (1941). Nor does uniqueness constitute a barrier. See Publicker v. Commissioner,206 F.2d 250, 253 (3d Cir. 1953). Indeed, *159 the use to which donated property will be put is an element in determining value. See Guggenheim v. Rasquin,312 U.S. at 257. This would appear especially to be the case where medical research equipment is involved. Cost has been accepted as an element of value (see Guggenheim v. Rasquin,312 U.S. at 258; Publicker v. Commissioner,206 F.2d at 254), including cost of reproduction. See Clinton Cotton Mills v. Commissioner,78 F.2d 292, 295 (4th Cir. 1935), reversing and remanding 28 B.T.A. 1312 (1933). In short, "All relevant facts and elements of value * * * shall be considered." See sec. 25.2512-1, Gift Tax Regs.; Publicker v. Commissioner,206 F.2d at 254. [Fn. ref. omitted.] In reaching our conclusion in the Cupler II case, reproduction cost was merely one of the elements considered.In fact we specifically pointed out that consideration was given to sales of a comparable machine. Petitioners rely heavily on the statement contained in the portion of the Cupler II case we have quoted above that the legal standard defining fair market value is singularly unhelpful where *160 neither party can produce evidence of the fair market value as articulated in the definition contained in the regulations and normally accepted. Petitioners argue that the negatives here involved are comparable to the machines involved in the Cupler II case. However, the facts in this case do not support petitioners' contention. There was in fact a sale of these negatives by Mr. Jacobs' daughter to petitioner approximately two years prior to the date of the gift of the negatives to the Historical Museum. While petitioners argue that this sale was not at arm's length, the record is devoid of any evidence to support such a conclusion. Insofar as this record shows, Mr. Jacobs' daughter may have been well aware of the value of the negatives. Furthermore, there is testimony by petitioners' expert that if the negatives were properly indexed, there would be individual buyers available who might be in the business of furnishing prints of areas as they existed at a prior time. According to petitioners' expert, it was the lack of indexing of the negatives which would create a problem with their sale. Petitioners' expert testified that the major entities interested in items such as *161 the negatives here involved were local museums and that such local museums rarely have available funds to purchase property comparable to the negatives but generally relied on gifts of such items. The case of Frazell v. United States,supra, relied on by petitioners, involved stock issued to a taxpayer for contribution to a corporation of maps. The maps were used in the corporate business. Both parties had attempted to value the maps on the basis of reproduction costs. The record shows that reproduction of the maps would have been possible at the time the maps were transferred to the corporation and the problem was merely the cost that would be entailed in such reproduction. Even under these circumstances, the Court did not rely exclusively on reproduction costs but rather stated: In assessing value, however, we do not base our valuation upon reconstruction costs alone.* * * we must * * * remain cognizant of the fact that prudent operators would not have been able to expend such a large amount upon the construction of the maps during 1951 in the Abilene area. * * * [269 F.Supp. at 890.] In the Clinton Cotton Mills case, the Court merely *162 held that in valuing a building, reproduction cost less depreciation was one method that should be considered in ascertaining fair market value. Here the negatives which covered the period 1962 through 1969 could not actually have been reproduced at the date the gift was made. It is this fact with forms the basis of petitioners' claim that the negatives are unique. The historical value of the negatives to the museum was the fact that the negatives were photographs of Santa Clara County and other areas of California as those areas existed in the years 1962 through 1969. The testimony showed that these areas had changed and in 1974 no longer remained as they were in 1962 through 1969. We have carefully considered the testimony of petitioners' expert witness and the testimony of petitioner. We conclude that the method used by petitioners' expert to value the negatives is not indicative of the fair market value or any other form of value of the negatives in the unindexed state in which petitioner contributed them to the Historical Museum. Substantial work would be required to put the negatives in such shape that they would have value either to be used for producing prints by persons *163 who might want such prints or to be used for historical studies. From petitioner's own estimate, this work would be costly. Petitioners further contend that the fact that the Geological Survey kept negatives similar to those here involved and used them to furnish either duplicate negatives or prints to persons requesting to purchase these items indicates a great value to the negatives petitioner contributed. The record, however, does not support this argument. The indication from the record is that the Geological Survey maintained its library of negatives to furnish duplicate negatives or prints to persons requesting them as a government services. There is no indication that the Geological Survey made a profit selling duplicate negatives or prints to persons requesting them. Also, the record is clear that the negatives owned by the Geological Survey were indexed so that they were easily useable for making a duplicate negative or a print when a request was made for either. There is no showing in this record of the extent of requests to the Geological Survey for duplicate negatives or prints or the amount received from the sale of these items. In order for any reasonable estimate *164 to be made of any possible expected income that might be derived from the use of the negatives here involved for sale of duplicate negatives or prints, even after the negatives were indexed, it would be necessary to show the extent of the demand for such items. Considering this record as a whole, including the fact that petitioner paid only $300 for the negatives and certain other items in 1972, the limited commercial value of the negatives even if they were indexed and the even more limited commercial value of the negatives in the unindexed state in which petitioner contributed them to the Historical Museum, the limited market for such negatives and the testimony of respondent's expert witness who had experience in valuing cultural property contributed to museums, we conclude that the $500 value determined by respondent's expert represents the fair market value of the 5,000 unindexed negatives on June 11, 1974, when petitioner donated them to the Historical Museum. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue. ↩
2. Sec. 170(e)(1) provides that with certain exceptions the amount of charitable contributions made in property shall be reduced by the gain on such property if such gain would not be long-term capital gain which would have been realized if the taxpayer had sold the property at its fair market value, and in some circumstances by 50 percent of the gain which would have been long-term capital gain if the property had been sold at its fair market value. Sec. 170(e)(1)(B) excepts from the 50 percent reduction contributions of tangible personal property which is to be used by the donee in connection with the purpose or function constituting the basis of its exemption under sec. 501. Respondent does not contend that petitioners are not entitled to deduct as a charitable contribution the total fair market value of the items contributed to the Historical Museum because of the provisions of sec. 170(e)(1). The parties have in effect stipulated that the negatives were a capital asset in petitioner's hands and that any gain on the sale of this asset would have been long-term capital gain. While the parties have not specifically stipulated that the use by the Historical Museum of the negatives is related to the purpose and function of the museum, they have stipulated into evidence letters effectively so stating. We do not consider any issue with respect to sec. 170(e)(1)↩ to be present in this case.
3. Sec. 1.170A-1(c)(1) and (2), Income Tax Regs., provides as follows: (c) Value of a contribution in property. (1) If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution reduced as provided in section 170(e)(1) and paragraph (a) of sec. 1.170A-4. (2) The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed. The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, but if he sells only at retail the usual market consists of his retail customers.↩